**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JOHN DOE**, | : |
| | : |
| **Plaintiff**, | : |
| | : |
| v. | : |
| | : **CIVIL ACTION NO.**_____ |
| **UNIVERSITY OF MASSACHUSETTS** | : |
| **AMHERST**, **LOUIS B. WARD**, *Assistant Dean* | : |
| *of Students, sued in his individual and official* | : |
| *capacities,* **PATRICIA CARDOSO-ERASE,** | : |
| *Associate Dean of Students, sued in her* | : |
| *individual and official capacities,* **DEBORA D.** | : |
| **FERREIRA,** *Title IX Coordinator, sued in her* | : |
| *individual and official capacities,* | : |
| | : |
| **Defendants**. | : |
| | : |
| | : |

## COMPLAINT

Plaintiff John Doe ("John") [1] files this Complaint seeking injunctive and declaratory relief and

damages against Defendant University of Massachusetts Amherst ("the University" or "UMass Amherst")

for gender-based discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C.

§§ 1681, *et seq.* ("Title IX"), and against three of the University's officials in their individual and official

capacities, Defendants Louis B. Ward, Patricia Cardoso-Erase, and Débora D. Ferreira, for violations of

the due process and equal protection requirements of the Fourteenth Amendment to the U.S. Constitution

pursuant to 42 U.S.C. § 1983.  In support of this Complaint, John alleges as follows:

---

[1]       Contemporaneously with the filing of this Complaint, John has filed an Umopposed Motion for Permission to Proceed Under Pseudonym as "John Doe" given the extremely sensitive and private nature of the matters alleged herein.  Plaintiff also seeks permission to refer to the female complainant in the underlying student disciplinary proceeding as "Jane Roe" and to use pseudonyms for student witnesses identified herein.  As more fully set forth in the Motion, the Defendants do not oppose the Motion; they are fully aware of the actual identities of John Doe, Jane Roe and student witnesses; and they will not be prejudiced in any way by John's use of those pseudonyms for public filings.

## I.     NATURE OF THE ACTION

1.     This lawsuit seeks relief from the University's grievous mishandling of a false allegation of sexual misconduct and the University's subsequent disciplinary proceeding.  John has completed all the course work and earned all the credits required for his undergraduate degree, and the University informed him this past Spring 2017 that he had graduated.  Yet, Defendants have withheld John's degree in contravention of the University's Academic Regulations and without a hearing, failed to keep him properly informed about the status of the disciplinary proceeding, and failed to timely schedule a hearing while John was still a student at the University and before he left the state for a new job.  Now, after an inordinate delay of more than 330 days following its receipt of the allegation, the University seeks to schedule a hearing. The delays by University officials, together with all of the other fundamentally unfair actions of University officials described in this Complaint, constitute violations of John's constitutional rights to due process and equal protection under the law and to a prompt and equitable disciplinary process under Title IX.

2.     The University's actions also fly in the face of interim Title IX guidance recently issued by the Department of Education Office for Civil Rights and public statements made by Education Secretary Betsy DeVos in recognition of the deprivation of due process rights of accused male students by universities. The Department promulgated the new guidance specifically to protect the due process rights of accused students and ensure fundamental fairness to all parties, but the University has ignored and continues to ignore these rights. (*See September 2017 Q&A on Campus Sexual Misconduct,* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf; *Secretary DeVos Prepared Remarks on Title IX Enforcement*, https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement).

**(i)      The Code does not apply to students like John who have graduated**

3.      But all of this comes too late.  The 2016-2017 University Code of Student Conduct (the "Code") under which Defendants seek to charge John does not apply because he is no longer a student at the University. (*See* 2016-2017 Code,

https://www.umass.edu/dean_students/sites/default/files/documents/2016-2017%20Code%20of%20Student%20Conduct.pdf ).[2]

4.      By its plain terms (in a provision titled "Jurisdiction"), the Code only applies to "any student enrolled in or accepted for an academic course or program."  Code § I(A)(1). Other sections of the Code also clearly indicate that it applies to current enrollees only, with the limited exception of students who have withdrawn from the University.  For example, the Code's sanctions provisions provide a list of sanctions that could not possibly apply to students who have graduated (*e.g.*, sanctions barring a student from University housing, or suspending or expelling a student).  The Code simply does not apply to graduates, like John.

5.      Furthermore, holding a hearing at this juncture would impose an unfair burden on John, who has moved out of state for his first full-time job and is no longer in a position to defend himself at a hearing.

**(ii)     Defendants intentionally failed to hold a hearing during the 2016-2017 school year**

6.      Defendants had ample opportunity to conduct a hearing, having learned of the allegation no later than November 2, 2016, when a female UMass Amherst undergraduate student, Jane Roe, reported an alleged sexual incident occurring on September 2, 2016.

---

[2]      The 2016-2017 Code was made effective as of July 1, 2016, and remains in effect at the University.

7.      Despite the passage of more than 330 days following Jane Roe's report, Defendants failed to even attempt to convene a hearing until now.  Under these circumstances, a fair hearing is no longer possible.

8.      Potential witnesses on John's behalf at the hearing have graduated and are no longer on campus.  John himself, who was a senior during the 2016-2017 academic year, has moved to his first full-time job, in a new city and state, and will be substantially prejudiced in his career by having to prepare for and participate in a hearing while balancing the rigorous demands of his new job.  Memories of witnesses have surely faded due to Defendants' arbitrary and capricious delay in scheduling a hearing, which has further prejudiced John.  Defendants either knew or should have known that John would be graduating and acted with deliberate indifference to his future and career prospects.

9.      Because they failed to convene a hearing with witnesses present on campus, Defendants have already deprived John of a fair hearing.

10.     For these reasons, among others, holding a hearing at this late juncture would violate John's right to due process and Title IX.

11.     Further, no purpose of Title IX would be served by any further sanction.  John has permanently left campus so Jane Roe cannot be deprived of educational opportunities as a result of John's presence on campus.  The Code explicitly states that its purpose is "educational," and no conceivable "educational" purpose could be served by a hearing at this juncture.

12.     Defendants' failure to have held a timely hearing remains unexplained and is entirely the Defendants' responsibility, as they have long known of the accusation.

13.     The University received notice of Jane Roe's allegations no later than November 2, 2016. In late January 2017, during the first week of the spring semester, John supplied the University and individual Defendants Louis B. Ward, the University's Assistant Dean assigned to investigate the

accusation, and Patricia Cardoso-Erase, the Associate Dean also involved in the investigation, with a list of student-witnesses. John also supplied these Defendants with witness statements on February 10, 2017, still early in the spring semester.

14. As John did not leave campus until mid-May 2017 after he completed all his coursework, finals and projects, Defendants had ample time before the school year ended to convene a hearing.

15. Defendants previously provided assurances that they would investigate promptly. In a conduct meeting on February 10, 2017, Ward told John that he would provide him with an investigative report in time for John to review it, submit objections and corrections, and have a second meeting with Ward before any hearing.

16. It was not until May 24, 2017, however, two weeks after graduation and after the school year had already ended, that John first received a cryptic message in an email from Ward: "This is notification that your Conduct Case Records Request has been completed on 5/24/2017."

17. Then on the Friday before Memorial Day, May 26, 2017, two weeks after John had permanently left campus, with deliberate indifference to John's having already graduated, Ward advised John that the Conduct Case Records were ready for hand pick-up (even though it was obvious that all students had left campus and Ward knew John lived in another state).

18. Finally, on June 14, 2017, more than three months after completion of the final witness interviews, Ward conducted a Conduct Conference with John and his advisor by telephone – due to John's relocation to another state for work – to provide information related to a Conduct Hearing.

19. On June 16, 2017, Ward emailed John that he (Ward) had concluded his investigation, that John's case had been referred to a Conduct Hearing Board, and that Dean Jonathan Connary would be in contact to discuss the scheduling of the hearing. John did not access this notice in his University email account until June 24, 2017.

20.     Further, on June 30, 2017, John's attorney wrote to UMass Amherst's Office of General Counsel raising concerns about the inordinate delay, among other issues.  On July 5, 2017, University counsel responded that the University would respond to the June 30 letter after conferring with the campus.

21.     Thereafter, 55 days passed without any response to the June 30 letter from the University.

22.     On August 29 John's attorney again contacted the General Counsel's Office to discuss the concerns raised in the June 30 letter.

23.     On August 24, 2017, Dean Connary sent an email to John's University email account (even though, based on prior notice from John, the University knew that he did not have regular access to his University email account) stating that John had until August 30 to express his preference for a single hearing for him and a former classmate who was also present during the alleged incident, or a separate hearing, and that if he did not respond within those six days, then Connary would assume John preferred a separate hearing board.

24.     Even though Dean Connary stated in his June 16, 2017 email to John that he would contact John to schedule a hearing, the Dean never contacted him about potential dates on which the University might schedule the hearing.

25.     Instead, on October 6, 2017, the University sent John a notice of hearing to take place in 12 days – on October 18 – alleging two violations of the Code of Student Conduct, for an incident alleged to have taken place on September 2, 2016, more than a year ago.  The University' s notice stated that John had just seven days, until October 13, to submit  to the Dean of Students Office information or documents or planned witnesses in connection with his hearing.  The University further stated that if John fails "to appear at the Hearing at the designated time and place without an agreed postponement, the Hearing will proceed in [his] absence."

26.     In its October 6, 2017 email notice, the University also issued what is in effect a gag order on John to avoid contacting potential witnesses on his behalf, by cautioning him (or anyone acting on his behalf, including attorneys) that he should avoid any actions that could be interpreted by the University as an attempt to intimidate or otherwise influence a witness connected with the incident, as that action could constitute a further violation of the Code of Student Conduct.

27.     Now, with the 2016-2017 school year over and a new school year beginning, after John has permanently moved to another state for his first full-time job and after witnesses have left campus, Ward and Connary are seeking to hold a hearing notwithstanding the obvious prejudice to John.

28.     The guiding principle established by Department of Education regulations is that grievance procedures to resolve such student complaints must be "***prompt and equitable***."  34 C.F.R. § 106.8(b) (emphasis added).  The procedures must assure that both sides in such proceedings are treated equally.  In fact, during the relevant time period, guidance from the Department of Education had established 60 days as a reasonable time frame, and the relevant regulations required that if there were delays for good cause, there should be notice to both parties regarding the delays.  The University's procedures mirrored that guidance. *See UMass Amherst Annual Security Report for 2016* (published in the year 2017), https://www.umass.edu/umpd/annual-security-report-2017, at 60-61.

Defendants' purported investigation took well over three times that length, 225 days, engendering the unfairness that the regulations seek to prevent.  As a result of Defendants' intentional, arbitrary, and unexplained delay, the purported investigation was not completed within the school year.  Students like John who have left the University for new jobs, particularly at distant places, have no ability to meaningfully participate in the process.  And, although the University's procedures purport to give students the protection of an evidentiary hearing, that protection is illusory if the student (as here) does not have a practical ability to call witnesses.

29.     To further prejudice John, and to keep him in a punishing, extended state of limbo, the University and the individual Defendants never provided him with any periodic updates on the status of the investigation and did not communicate at all with him about this matter during the final three months of the spring semester following the February 10, 2017 Conduct Conference, and for two more weeks after the academic year and graduation.

30.     In contrast, Ward communicated status updates only to Jane Roe on February 27, 2017, scheduled appointments with her on March 31, 2017 and April 6, 2017 (both which she failed to attend), and met with her on April 27, 2017, at which time he provided her with an update on the participation of witnesses and the next steps in the investigation.

31.     This differential treatment violates clear federal regulations that specify that a prompt, fair, and impartial proceeding includes a proceeding with notice to both parties of any delay in the process and the reason for the delay. *See, e.g.*, 34 C.F.R. § 668.46(k)(3)(i)(A).

32.     The University's and the individual Defendants' failure to treat both parties in the same manner during the investigation reflects intentional gender discrimination against John and violations of Department of Education investigation requirements.

> **(iii)    Ward served in the dual conflicting roles of investigator of Jane Roe's allegations and advocate for Jane Roe as the "victim"**

33.     Ward, as the University's investigator in the case, was tasked not just to investigate Jane Roe's allegations but also to "provide support, advocacy, assistance, and connection to resources" to her as the "victim."  (*See* http://www.umass.edu/titleix/reporting/my-reporting-options/if-i-want-investigation-who-will-handle-it). This dual role of advocate for the accuser and investigator of the allegations against the accused created a clear conflict for Ward.

34.     The University's Title IX Coordinator, Defendant Ferreira, was notably absent and uninvolved during Ward's Title IX investigation.  In addition to allowing Ward to serve in conflicting

roles in the investigation, she failed to exercise oversight to ensure the investigation complied with the requirements of Title IX.

> **(iv)    Defendants impeded John from preparing his defense and failed to obtain critical evidence and witness statements**

35.    The University and individual Defendants deprived John of due process and violated Title IX by impeding John's ability to prepare his defense. Ward asked potential witnesses to avoid discussing the matter "with others" in "an effort to protect  . . . the integrity of the investigation."

36.    Ward did not qualify his warning, leaving the student recipient to conclude that he or she could not speak with John without risking harm to the University's investigation.  In light of Ward's position of authority at the University, this warning had the effect of a gag order that deterred potential communications between John and possible witnesses, impeded John from learning pertinent factual information, and hindered John's preparation of his defense at a potential hearing, all in violation of his due process rights.

37.    In its recent Hearing notice, the University also warned John to avoid (unspecified) actions that the University might interpret as an attempt to influence or intimidate a witness, thereby impeding John's ability to communicate with witnesses.

38.    Now that potential witnesses have left campus, some permanently, these gag orders have effectively prevented John from speaking to certain witnesses.  And of course memories have grown stale by the weeks and months, especially as students have now left campus and moved on with their post-University lives.

39.    Further, Ward failed to interview all potential witnesses and made no effort to obtain potentially exculpatory evidence, including Jane Roe's highly relevant text messages.

### (v)     UMass Amherst and Cardoso-Erase intimidated members of John's fraternity

40.     The University and Cardoso-Erase used other tactics to intimidate witnesses.  Within days of the February 10, 2017 Conduct Conference at which John identified several fraternity members as potential witnesses, the University and Cardoso-Erase launched an investigation into whether John's fraternity had violated school regulations.  This investigation effectively discouraged the participation of witnesses who might help John.

41.     On information and belief, other than notifying the fraternity of the investigation, the University did not take any further steps.  Even though Defendants will likely claim that the fraternity investigation is unrelated to John's, based on the timing of the fraternity investigation and the absence of further activity within it, a strong inference can be drawn that its primary purpose was to chill fraternity members from cooperating in the investigation of John's case in disregard for John's constitutional rights and his rights to an "equitable" investigation under Title IX.

42.     In addition to violating basic due process principles and the Title IX requirement that the investigation must be "prompt and equitable," warning students not to discuss the matter and launching an investigation into the fraternity constituted intimidation of witnesses in violation of  Title IX regulation, 34 C.F.R. § 100.7(e), which provides that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part."

43.     Defendants Ward and Cardoso-Erase knew or should have known that they were intimidating witnesses in violation of this Title IX regulation.

44.     Regardless of intent, it was reasonably foreseeable that the fraternity investigation would have an intimidating effect on fraternity members, who could face group sanctions under the Code.  Ward

and Cardoso-Erase knew or should have known that their conduct would deprive John of his constitutional rights to due process and would violate Title IX.

### (vi)   UMass Amherst and Cardoso-Erase imposed punitive interim restrictions

45.     The University's and Cardoso-Erase's imposition of "interim restrictions" also violated John's due process rights and Title IX and caused tremendous suffering to John.  Among the restrictions imposed, John was barred from participating in any University-sponsored activities for the entire spring 2017 semester and for three weeks before the semester started.  A portion of John's tuition was devoted to University-sponsored events and restricting him from participating in those activities without any hearing deprived John of a property interest without due process.

46.     Interim restrictions are imposed to ensure equal access to educational programs and activities and protect the complainant as necessary.  Defendants, however, never even attempted to show that the interim restrictions placed on John were necessary to protect the complainant or to ensure her equal access to educational programs and activities.

47.     Additionally, under the Code, the University may impose interim restrictions without prior notice only when "in the professional judgment of a properly designated University official there is reason to believe that the student is an imminent threat to himself or herself, to others, or to property, or to cause imminent disruption to the orderly operation of the University."

48.     There was no basis for any such finding here.

49.     The Code further provides that "[a]t the meeting [between the student and the designated University official], if the alleged conduct is denied ... the official or her or his designee shall determine in writing whether the interim restrictions will continue or others be imposed, together with the reasons therefore."  John was not provided with such a writing following the conduct meeting.

50.     Most significantly, the interim restrictions prevented John from attending his own graduation ceremonies causing John severe humiliation and emotional distress, as his absence from the ceremonies was on full display to his friends and family.

51.     At the time John was barred from graduation due to the interim restrictions, the University sent him many invitations to attend and touted graduation ceremonies as a once-in-a-life time experience best shared with fellow graduates.  Following graduation, the University sent John congratulations for graduating (accompanied by solicitations for donations).

52.     Depriving John of the opportunity to attend his graduation ceremonies constituted the taking of a property interest without due process and the humiliation and mental distress caused by the lengthy interim restrictions constitutes compensable damages.  During interim restrictions, John faced a hostile environment and suffered from a substantial diminution in the value of his education.

53.     Defendants' deprivation of John's rights through interim restrictions was wholly intentional and they imposed the restrictions with callous indifference to John's rights and well being. Recognizing the severely damaging impacts that she knew interim restrictions would have, Cardoso-Erase, in her written notice of interim restrictions, advised John that "you may experience feelings of anxiety and uncertainty during this process."

54.     With this knowledge, Cardoso-Erase maintained the interim restrictions for four and a half months without ever examining whether they were actually necessary.

55.     In John's case, the interim measure he received was overly broad and effectively barred him from participating in any graduation related activities and all University-sponsored activities for more than the entire spring semester. The unnecessarily broad and restrictive nature of the interim restriction was particularly inappropriate given the substantial delay in the investigation and the complete absence of Title IX Coordinator Ferreira as the investigation dragged on.

56.     Indeed, it does not appear that Title IX Coordinator Ferreira reviewed the status of the investigation or was in communication with John to ensure the January 4, 2017 interim restriction was "necessary and effective."  This demonstrates a clear violation of the requirement that there be communication throughout the investigation regarding interim measures.

57.     As a result of Defendants' conduct, John was deprived of equal access to education and suffered a significant loss of educational benefits in violation of the due process clause and Title IX.

**(vii)    UMass Amherst has improperly withheld John's degree, in violation of John's due process rights and Title IX, and in contravention of its own Academic Regulations**

58.     UMass Amherst's unwarranted decision to withhold John's degree violates both John's due process rights and the educational benefits protected by Title IX.

59.     On June 8, 2017, UMass Amherst sent an e-mail to John's University e-mail address indicating that he "did not graduate" because he "did not complete his University requirements." John, who, by June 2017, had moved to a new state and lacked internet access during his transition, did not see the email at this time.  In fact, John did not learn of the June 8 e-mail until an inquiry was made to the University in late August 2017 about the status of John's diploma.

60.     Regardless, the June 8 e-mail did not inform John that his degree was being withheld because of a disciplinary hold but instead contained what was clearly form language stating that the Registrar was withholding John's degree because of a "HOLD for outstanding university obligations (i.e. student bill, parking, University Health Services, etc.)."

61.     The University sent this email to John's University email address even though he no longer is a student at the University.

62.     The requirements for obtaining a degree at UMass Amherst are governed by the Academic Regulations ("the Regulations"), an annual publication by UMass Amherst that states that the regulations

contained therein represent the "official position of the University of Massachusetts Amherst and apply to all undergraduates."

63.     The Preface to the 2016-2017 Regulations states that the "academic regulations should both stipulate the faculty's requirements for a degree and provide students with guidelines for achieving their personal academic goals…."

64.     The Regulations set forth UMass Amherst's "Graduation Requirements," including "credit requirements," "grade point average," and "general education requirements."

65.     The Regulations also require that the student not be "administratively withdrawn" in order to graduate.  The administrative withdrawal conditions are limited to certain outstanding financial obligations or "forgery, fraud, or falsification of information on any official University form or document[.]"

66.     The decision of UMass Amherst to withhold John's degree was not based on a failure to comply with the stated "graduation requirements" set forth in UMass Amherst's Regulations or for having met any of the conditions for administrative withdrawal.

67.     UMass Amherst did not identify a specific basis for its decision, thereby depriving John of the basic procedural protections that he is guaranteed by the U.S. Constitution and the benefit of his educational rights as protected by Title IX.

68.     Further, the University's decision to withhold John's degree was made without a hearing taking place. Thus, John has been denied the benefit of his degree without the opportunity to defend himself.

69.     As a result of Defendants' improper withholding of John's degree, Defendants have deprived John of the benefits associated with degree conferral in violation of his due process rights and Title IX.

**(viii)   Ward violated John's confidentiality rights**

70.     Ward's dual and conflicted role led to his intentionally violating John's confidentiality rights in connection with the supposed "investigation."

71.     The Code provides that "All members of the community are expected to … maintain appropriate privacy for investigations," Code § II, and "[e]xcept as provided in the [Code], the University shall not communicate a student's disciplinary record and related information to any person or agency without the prior written consent of the student or, when the student is a minor, of the student's parents or legal guardian, except as required by law.  All proceedings under the [Code] shall be confidential." *Id*. § IX.

72.     In violation of these rules, Ward conducted his initial interview of Jane Roe before a close friend of the complainant who was present for moral support (and not as a witness) and who was not even identified as a "member of the [University] community" and, therefore, not subject to University sanction for revealing confidential information.

73.     Ward again violated John's confidentiality rights by conducting a second interview of Jane Roe before a different advisor, again with no assurance of confidentiality.

74.     In any event, the Code contains a discriminatory policy of confidentiality as between the accused and the accuser, providing protection only for the latter: "At all times the privacy of reporting parties and their witnesses will be treated with the utmost respect." *Id*. § II. No similar protection is afforded to the privacy of accused parties and their witnesses.

**(ix)   UMass Amherst's procedures for investigations and hearings are intentionally permeated with gender bias**

75.     The University's Code and Title IX policies and procedures are permeated with intentional, institutionalized gender bias against male students accused of sexual misconduct.  This bias

has resulted in the discriminatory treatment of John in that Defendants have intentionally violated his constitutional rights.

76.     Although ostensibly framed in gender-neutral terms, the Code's policies and procedures are based on unfair and antiquated gender-biased stereotypes that female complainants are invariably "victims" and "survivors" and accused male students are "hegemonic male[s]" invariably prone to sexual violence.

77.     Under the supervision of Title IX coordinator Ferreira, the University's investigatory process presumes the veracity of female complainants' reports of sexual assault and shifts the burden on the male students they have accused to prove their innocence. Official University publications exhort all members of the University community to "BELIEVE" complainants, who are presumed to be "victims" and "survivors" of sexual assault on the basis of having made an accusation.

78.     The University touts its "survivor-centered response" to sexual assault reports, in which the University's investigators in the Dean of Students Office (including Ward) are trained by Ferreira, in conjunction with the University's Center for Women and Community, to "prioritize[e]" their "sensitivity" to "the emotional and physical safety of the survivor," and to "balance[ ] the mandate to investigate reported assaults with a response that empowers survivors to take back control of their lives." (*See* https://www.umass.edu/titleix/title-ix-reporting-and-response).

79.     There does not appear to be any training or instruction in any of the University's publications on how investigators are to objectively and diligently collect and examine evidence.

80.     The University's institutionalized bias and conflict of interest also extends to the hearing process.

81.     Like the investigators, all persons appointed to Student Conduct Hearing Boards ("Hearing Boards") are required to attend a brief (5-hour) training overseen by Ferreira and the University's Title IX

Office, in conjunction with the University's Center for Women and Community, so that Hearing Board members will "have a better understanding of trauma and the impact of trauma," and "will discuss strategies and considerations for engaging in a conduct process that is sensitive to the needs of survivors." (*See* https://www.umass.edu/cwc/our-events-1).

82.     The University's stereotypical attitudes about male sexuality are best exemplified by the University's creation and sponsorship of the UMass Men and Masculinities Center, which offers workshops and events with the goal of "Creating Healthy Masculinities."  That Center's website asserts that "[t]here is a growing body of literature suggesting that men who adhere to 'hegemonic masculinity' (or more traditional constructions of masculinity) are less likely to engage in health promoting behaviors, more likely to accept violence as part of the masculine norm, and more likely to engage in a range of unhealthy and risky behaviors including ... [s]exual and relationship violence." (*See* https://www.umass.edu/masculinities/about/workshops-events).

83.     This University-sponsored organization presumes that men (but not women) will engage in "unhealthy and risky behaviors," including "[s]exual and relationship violence."

84.     The Men and Masculinities Center was created by the University as a direct response to criticism resulting from its placement in May 2014 on the first official list of universities that were the subject of investigations by the Department of Education Office for Civil Rights ("OCR").

### (x)     UMass Amherst's Code is biased against male students

85.     Furthermore, the University's policies and procedures are deliberately designed to be biased in favor of female complainants.  As a result, a hearing and any subsequent appeal lack critical procedural safeguards to protect students like John wrongly accused of sexual misconduct and facing potentially life-altering penalties, including the threat of suspension or expulsion.

86.     The Code does not provide accused students with notice of the procedures to be used at the hearing, does not permit counsel to participate in any hearing, even when serious sanctions such as

expulsion can be imposed, does not permit a meaningful right to cross examine witnesses, including the complainant, and is unclear who has the burden of proof.

87.     The Code's appeal process is similarly lacking in due process protections and fundamental fairness.  An accused student held responsible at the hearing level has no right to appeal on the basis that the weight of evidence does not support the finding of responsibility, and an appeal exposes an accused student found responsible at the hearing level to be subjected to an even greater sanction on appeal, rendering any appeal rights illusory.

88.     The individual Defendants, who are state officials charged with administering Title IX at UMass Amherst, have acted with deliberate indifference to John's constitutional rights to due process. Defendants have also engaged in gender discrimination in violation of Title IX, including but not limited to failing to comply with the "prompt and equitable" requirement of a Title IX investigation.

89.     Faced with dubious "statistics" purportedly showing high numbers of campus sexual assaults, starting in 2011, OCR issued guidance to University Title IX administrators on the conduct of sexual assault investigations and hearings.

90.     The OCR guidance rendered it virtually impossible for charged students, virtually all male, to defend themselves against accusations of sexual assault.  By facilitating the sanction of male students, OCR sought to counter the narrative that accused male students were frequently getting away with sexual assault.

91.     OCR, in effect, enabled a system in which state and private universities can easily strip students of their rights.  In the case of state universities, this violates the due process clause of the U.S. Constitution, as University officials act under color of State law.

92.     Even though on September 22, 2017, the Department of Education rescinded its 2011 Guidance and 2014 Questions & Answers, and issued new Guidance that reaffirmed the principles

embedded in Title IX without adding any legal requirements, the University failed to make any changes to its Code to ensure the presence of basic procedural safeguards.

93.     John seeks preliminary and permanent injunctive relief to bar any further disciplinary proceedings, including a hearing.  In addition, John seeks compensatory damages against the individual Defendants in their individual capacities for depriving John of his property and liberty rights to due process under the U.S. Constitution with callous indifference to John's constitutional rights.

## II.     THE PARTIES

94.     Between September 2013 and mid-May 2017, Plaintiff John Doe was enrolled as a full-time, tuition-paying, undergraduate student at University of Massachusetts Amherst.  John successfully completed all of his University graduation requirements in May 2017.  John has not been the subject of any University disciplinary proceedings other than this matter.

95.     Defendant University of Massachusetts Amherst is a public university organized and operated by the Commonwealth of Massachusetts.

96.     Defendant Louis B. Ward is and has been at all times material to this Complaint the Assistant Dean of Students in the Dean of Students Office at UMass Amherst.  Ward is sued in his individual and official capacities.  All of Ward's activities described in this Complaint were under color of Massachusetts laws.

97.     Defendant Patricia Cardoso-Erase is and has been at all times material to this Complaint an Associate Dean of Students in the Dean of Students Office at UMass Amherst.  Cardoso-Erase is sued in her individual and official capacities.  All of Cardoso-Erase's activities described in this Complaint were under color of Massachusetts laws.

98.     Defendant Débora D. Ferreira is and has been at all times material to this Complaint the Title IX Coordinator at UMass Amherst.  Ferreira is sued in her individual and official capacities.  All of Ferreira's activities described in this Complaint were under color of Massachusetts laws.

### III.     JURISDICTION AND VENUE

99.     Subject matter jurisdiction for this action is proper under 28 U.S.C. §§ 1331 and

1343(a)(4), because it seeks equitable and monetary relief under an act of Congress, 42 U.S.C. § 1983,

enacted for the protection of Plaintiff's federal civil and constitutional rights, including his rights to due

process and equal protection under the law as a public university student, and the rights afforded to him

by Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*  This Court has original

federal question jurisdiction over both claims.

100.     Personal jurisdiction over the Defendants named in this action is proper because they

reside in the Commonwealth of Massachusetts, and the cause of action arose in Massachusetts.

101.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391(b) because

a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### IV.     FACTUAL ALLEGATIONS

**A.     The Alleged Incident and the University's Initial Actions in Response**

102.     On or about November 2, 2016, Jane Roe filed a "Public Report" with the University's

Dean of Students Office, without identifying John, claiming sexual misconduct on September 2, 2016.

Her complaint also included a claim against a second student whom she alleged was also present with

John at the time of the alleged incident more than a year ago.

103.     On December 6, 2016, Jane Roe met with Ward.  Ward prepared a Report of the meeting

on December 7, 2016.  Jane Roe attended the meeting with a friend who was there for moral support.

Jane Roe spoke about John at the meeting.

104.     John first learned that he had been accused of sexual misconduct on January 4, 2017,

during winter break, before the spring semester started, when Cardoso-Erase sent John an Interim

Restriction Notification ("IRN"), summarily notifying him that he was barred from all University housing

and activities and putting in place a no contact order between him and Jane Roe.  The IRN stated, without

further information, that John's conduct on September 2, 2016, may have violated two sections of the Code, one relating to Sexual Misconduct and one relating to Sexual Harassment.

105.    John was instructed that he "must" contact the Dean of Students Office within five days to set up a meeting, at which he would have the opportunity to discuss the restrictions, his involvement in the alleged incident, and options for resolution.  To determine his rights, he was instructed to go to the Dean of Students Office website to review the Code.  Cardoso-Erase mandated John's attendance at a Conduct Conference before providing John with a "Notice of Charge," required under the Code, containing a "summary of the facts" upon which the charges are based.

106.    As of this date, John still has not received a Notice of Charge that conforms to the University's own requirements under the Code. Code § II(B)(2)(a).  Neither Ward nor any other administrator has provided John with notice of the nature of the substantive "sexual misconduct" provisions of § V(B)(2) or the "sexual harassment" provisions of § V(B)(2)(a) he is alleged to have violated.

107.    On January 19, 2017, John's advisor wrote to UMass Amherst counsel informing counsel that John had not received a "Notice of Charge," as required under § II.B.2.a of the Code, which should contain "a summary of the facts upon which the charges are based, including the date and location of the incident."

108.    In that letter, John's advisor also stated that the "Summary of Information Received" in the January 4, 2017 IRN John received did not contain critically important information, such as the location of the alleged incident, the time it occurred, the nature of the lack of consent (physical force, coercion or intimidation, claimed incapacity due to alcohol, etc.).

109.    On January 26, 2017, in the first week of the spring semester, Ward emailed John informing him that he had until February 3, 2017 to reschedule his Conduct Conference or the school

would be "moving forward regarding [his] pending case."  Defendants appeared to be rapidly moving toward a hearing.

110.    On that same date, Ward sent a letter to John with the following documents enclosed: Ward's notes from his December 6, 2017 meeting with Jane Roe; a December 8, 2016 email from Jane Roe to Ward containing screenshots of text messages; and, Jane Roe's email to Ward clarifying the screenshots and cell phone call records, the latter of which she had sent on January 16, 2017.

111.    Ward wrote to John that "identifiable information pertaining to other students has been concealed to protect their privacy."

112.    On January 27, 2017, still in the first week of the spring semester, John's advisor wrote separately to Ward and Cardoso-Erase what he and John believed was a lack of investigation by the Dean of Students Office to determine whether formal charges against John were warranted.  John's advisor provided Ward and Cardoso-Erase with a list of student-witnesses who should be interviewed as part of such investigation.

113.    On February 10, 2017, John appeared at a Conduct Conference with Ward and unequivocally denied the alleged misconduct.  John also supplied Ward with statements of three student-witnesses who had personally observed Jane Roe during the events in question on September 2, and reiterated his prior request that Ward interview those witnesses and others John had previously identified, including some members of John's fraternity.  Ward stated at the February 10 Conference that he would interview the students whose names were provided.

**B.    The University's Inadequate and Unconscionably Prolonged Investigation**

114.    Since that February 10, 2017 meeting, Ward has not conducted a thorough, competent, or fair investigation to which John is entitled, and yet has deliberately and unnecessarily prolonged the investigation and delayed a hearing to maximize the prejudice to John.

115.     Ward interviewed certain witnesses.  Following each interview, Ward sent an email to that witness warning the witness to avoid discussing the matter with others.

116.     Furthermore, around the same time as the February 10, 2017 Conduct Conference at which John told Ward that members of his fraternity were witnesses, Cardoso-Erase launched an investigation into the fraternity.

117.     Defendants did not provide John with any information about his investigation between the February 10 Conduct Conference and May 24, when Ward notified John that his Conduct Case Records Request had been completed.  Defendants never updated John on the status of the investigation despite OCR requirements that they do so and despite John's written request to Ward following the February 10 Conduct Conference that he do so.

118.     Following the February 10, 2017 Conduct Conference, John received only a modicum of information from Ward relating to the charges, including what appeared to be cherry-picked text messages that Jane Roe provided to Ward, without any clarification from Ward or Cardoso-Erase whether she had provided all relevant text messages or whether the University had requested that all relevant text messages be provided.

119.     The Conduct Case Records – produced by the University on June 5, 2017 – revealed that during interviews with student witnesses, Ward received information that Jane Roe had sent a text message to one of the student witnesses shortly after the alleged events.  Despite Ward's general request to Jane Roe to provide the University with all relevant text messages, Jane Roe never provided this text message to Ward or any other University official.  As described by the witnesses, this text message offered a valuable indicator of Jane Roe's state of mind and her clear recollection of the events.

120.     There is no indication that once Ward learned of the text message that he asked the students or Jane Roe to produce the referenced message or investigate why Jane Roe had failed to comply

with his request in the first place.  Ward also failed to investigate whether additional text messages existed that would provide similarly relevant information about the alleged incident.

121.    Ward further undermined the thoroughness of his investigation by telling each potential witness that his or her cooperation with the Dean's Office in the investigation was purely voluntary.  As a result, Ward did not interview a number of potential witnesses whom he had contacted.

122.    Ward's failure to investigate all of the relevant information uncovered during the investigation has allowed potentially exculpatory evidence to slip away, thereby impeding John's ability to defend himself.

123.    The Conduct Case Records also revealed that Wards' witness interviews included his critiques of discrepancies he perceived in their testimony, but he failed to critique the discrepancies in Jane Roe's complaint and witness statements.

124.    The University represents that it usually resolves complaints of sexual misconduct within 60 days of the report, with extensions of time for good cause, and that it notifies to the parties about any delay and the reasons for the delay.  *See UMass Amherst Annual Security Report for 2016*, https://www.umass.edu/umpd/annual-security-report-2017, at 60.   John was not notified that the University needed an extension of time of its 60 day resolution period, nor did it notify him of a delay or the reasons for any such delay.

125.    As a result of Defendants' inexplicable delay, the purported investigation was not completed within the school year.

126.    In addition, and contrary to the September 22, 2017 Department of Education Guidance that stated an "investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence," Ward did not prepare a report summarizing the relevant exculpatory and

inculpatory evidence, and never produced an inculpatory text message sent by Jane Roe shortly after the alleged incident.

      **C.**    **The University Now Purports to Hold a Hearing After John's Senior Year and Without Witnesses Who Have Graduated**

127.    Classes ended on May 2, 2017 and final examinations ended on May 10, 2017.  Graduation ceremonies that John was prohibited from attending due to interim restrictions occurred on May 12 and May 13, 2017.

128.    John only received notice the investigation was complete on May 24, 2017, even though no witness interviews took place after March 8, 2017 and Ward conducted a meeting with Jane Roe on April 27, 2017.  John finally received his Conduct Case Records on June 5, 2017.

129.    On June 14, 2017, more than three months after the completion of witness interviews, John's final Conduct Conference with Dean Ward took place by telephone.  On June 16, 2017, Ward send an email to John's University email account stating that he (Ward) had concluded his investigation, that John's case had been referred to a Conduct Hearing Board, and that Dean Jonathan Connary would be in contact to discuss the scheduling of the hearing.  John did not access that notice until June 24, 2017.

130.    Ward's June 16 communication to John was misleading and displayed indifference to John's rights.  After acknowledging that John may experience feelings of anxiety and uncertainty during the process, Ward stated that "the following is a list of campus resources that can assist you through the conduct process."  Ward wrote that despite being told that John had recently moved out of state and thus cannot access "campus resources" and, moreover, because John has already graduated, he is no longer likely to be even permitted to utilize "campus resources."

131.    At this juncture, witnesses have left campus.  Graduating seniors and transfer students will never return.  John has moved to a new job in a new city and state and will be substantially prejudiced by having to prepare for and participate in a hearing at this juncture.  The Code does not provide for students

who have graduated to be subject to disciplinary hearings.  By deliberately sitting on their hands with callous disregard for John's rights, Defendants created this irreparable prejudice.

132.    To further prejudice John and keep him in an extended period of uncertainty, the University did not provide him with periodic updates on the status of the investigation, in contrast to the updates Jane Roe received from the University and Ward.

133.    Now with John's senior year of college long over, Defendants seek to hold a hearing despite the obvious prejudice to John.

**D.      The University Has Improperly Withheld John's Degree Without Holding a Hearing**

134.    UMass Amherst's unwarranted decision to withhold John's degree violates both John's due process rights and the educational benefits protected by Title IX.

135.    On June 8, 2017, UMass Amherst sent an e-mail to John's University e-mail address indicating that he "did not graduate" because he "did not complete his University requirements." John, who, by June 2017, had moved to a new state and lacked internet access during his transition, did not see the email at this time.  In fact, John did not learn of the June 8 e-mail until a late August 2017 inquiry to the University regarding the status of John's diploma.  The UMass Amherst website states that diplomas for May 2017 graduates would be sent in August 2017.

136.    The June 8 e-mail stated that the Registrar of the University was withholding John's degree because of a "HOLD for outstanding university obligations (i.e. student bill, parking, University Health Services, etc.)."  The e-mail did not state that UMass Amherst was withholding John's degree because of a pending disciplinary proceeding.

137.    The University sent this email to John's University email address even though he no longer is a student at the University.   The requirements for obtaining a degree at UMass Amherst are governed by the Academic Regulations ("the Regulations").

138.    The Regulations are contained in an annual publication by UMass Amherst that sets forth the "official position of the University of Massachusetts Amherst and apply to all undergraduates."

139.    The Preface to the 2016-2017 Regulations state that the "academic regulations should both stipulate the faculty's requirements for a degree and provide students with guidelines for achieving their personal academic goals…."

140.    The Regulations set forth UMass Amherst's "Graduation Requirements," including "credit requirements," "grade point average," and "general education requirements."

141.    The Regulations also require that the student not be "administratively withdrawn" in order to graduate.  The administrative withdrawal conditions are limited to certain outstanding financial obligations or "forgery, fraud, or falsification of information on any official University form or document[.]"

142.    The decision of UMass Amherst to withhold John's degree was not based on a failure to comply with the stated "graduation requirements" set forth in UMass Amherst's Academic Regulations or for having met any of the conditions for administrative withdrawal.

143.    UMass Amherst did not identify a specific basis for its decision, thereby depriving John of the basic procedural protections that he is guaranteed by the U.S. Constitution and the benefit of his educational rights as protected by Title IX.

144.    Further, the University's decision to withhold John's degree was made without a hearing taking place. Thus, John has been denied the benefit of his degree without the opportunity to defend himself.

145.    As a result of Defendants' improperly withholding of John's degree, Defendants have deprived John of the benefits associated with degree conferral in violation of his due process rights and Title IX.

146. In addition to UMass Amherst's failure to adhere to its own regulations, it also failed to ensure that John was properly notified of its decision to withhold his degree.

147. For instance, on June 8, 2017, the very same day that the e-mail notification about the withholding of John's degree was sent to John's University e-mail address (even though he was no longer a student at the University), Ward had a discussion with John's advisor about the status of the disciplinary proceeding. Ward did not mention UMass Amherst's decision to withhold John's degree. Ward's decision to not communicate the information about withholding John's degree is particularly offensive and perplexing given that the Code provides that potential sanctions are to be discussed at the Conduct Conference.

148. On June 14, 2017, at John's Second Conduct Conference, Ward again failed to communicate to John or his advisor that UMass Amherst was withholding John's degree.

149. On June 21 and June 26, John's advisor e-mailed Ward and UMass Amherst's General Counsel's Office to advise them that John did not have internet access and requested that Ward copy him, as John's advisor, on any e-mails. Once again, Ward did not mention a hold on John's degree.

150. UMass Amherst and Ward repeatedly failed to ensure that John was informed in a timely manner about its improper and unfounded decision to withhold his degree, even though they knew John was no longer a student at the University and even after learning that John did not have access to the internet during his transition to another state.

151. The University's actions were in violation of John's due process, equal protection, and Title IX rights.

**E.      The Federal Statutory, Regulatory, and Constitutional Framework**

**1.      Requirements of Title IX and Implementing Regulations**

152.    The issue of sexual assaults on college and university campuses is, at the federal level,
addressed by an act of Congress known as Title IX of the Education Amendments of 1972, 20 U.S.C. §§
1681-1688.

153.    Title IX provides in relevant part that "[n]o person in the United States shall, on the basis
of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination
under any education program or activity receiving Federal financial assistance."

154.    Under U.S. Supreme Court precedent, Title IX allows private parties to file suit against
educational institutions receiving federal funds for "intentional discrimination." *Jackson v. Birmingham
Bd. of Educ.*, 544 U.S. 167, 173 (2005).

155.    The meaning of "discrimination" under Title IX is "differential treatment" or "less
favorable treatment," and "covers a wide range of intentional unequal treatment." *Id*. at 174-75.

156.    From Title IX's enactment in 1972 until 1997, the Department of Education did not
recognize sexual harassment (including sexual assault) as a form of sex discrimination in violation of
Title IX.  In 1997, however, the Department issued regulations that require colleges and universities
receiving Federal funds to establish policies and procedures to address sexual assault, including student-
on-student complaints.  *See* 62 Fed. Reg. 12034.

157.    The guiding principle established by the Department's regulations is that grievance
procedures to resolve such student complaints must be "***prompt and equitable***."  34 C.F.R. § 106.8(b)
(emphasis added).  The procedures must assure that both sides in such proceedings are treated equally.

158.    In 2001, OCR issued guidance  after public notice and opportunity to comment in a
document entitled "Revised Sexual Harassment Guidance:  Harassment of Students by School

Employees, Other Students, or Third Parties" ("2001 Guidance"), available at

http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf

159.    OCR's 2001 Guidance requires schools to provide the following procedural guarantees:

- "***Notice to students . . . of the [school's] procedure***";

- "***Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence***";

- "***Designated and reasonably prompt timeframes for the major stages of the complaint process***."

*Id.* at 20 (emphasis added).

160.    OCR's 2001 Guidance further provides that "[*a*]*ccording due process to both parties involved*, will lead to sound and supportable decisions." *Id.* at 22 (emphasis added).   Title IX's "due process" requirement applies to both state and private colleges and universities.  *Id.* at 2, 22.

161.    Colleges and universities also have the obligation under Title IX to "make sure that all designated employees have adequate training as to what constitutes sexual harassment and are able to explain how the grievance procedure operates."  *Id*. at 21.

### 2.    OCR's "Dear Colleague" Letter and Threat of Cutting off Funding

162.    In April 2011, without public notice and comment, OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague" Letter. (*See* "Dear Colleague" Letter, Apr. 4, 2011, available at http://www.2ed.gov/about/offices/list/ocr/letters/colleagues-201104.pdf ).

163.    Although the "Dear Colleague" Letter reaffirms OCR's 2001 Guidance requirement that both parties involved in sexual misconduct proceedings "must have an equal opportunity to present relevant witnesses and other evidence," *id*. at 11, it stated that schools "must use a preponderance of the evidence standard (*i.e*., it is more likely than not that sexual harassment or violence occurred)," and must

not use the "clear and convincing standard (*i.e.*, it is highly probable or reasonably certain that the sexual harassment or violence occurred.)"  *Id*.

164.    Even though the "Dear Colleague" Letter merely offers guidance, OCR nevertheless, framed the use of the preponderance of the evidence standard as a mandatory requirement.

165.    Even more ominously, the "Dear Colleague" Letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation."  *Id*. at 16.

166.    This portion of the "Dear Colleague" Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual assault proceedings as OCR wanted. (*See* NPR, "How Sexual Assaults Came to Command New Attention," Aug. 13, 2014, available at http://www.npr.org.2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention).

167.    In January 2014, the White House put further pressure on colleges and universities to prevent and police sexual violence on their campuses by creating a task force of senior administration officials to coordinate Federal enforcement efforts.

168.    In February 2014, Catherine E. Lhamon, then the Assistant Secretary of Education and head of OCR, told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes.

169.    According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." (*See* "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, Feb. 11, 2014).

170.    In April 2014, OCR issued its guidance, "Questions and Answers on Title IX and Sexual

Violence."  Although the Questions and Answers reiterated OCR's 2001 Guidance that compliance with

Title IX requires procedures "for adequate, reliable, and impartial investigation of complaints, including

the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence," it

strongly implied that allowing an accused student to cross-examine his accuser could create a "hostile

environment" and put a college or university in violation of Title IX. (*See*

https://www2.ed.gov/about/offices/list/ocr/.../qa-201404-title-ix.pdf, at 12, 25, 31).

171.    The Questions and Answers made clear that a school's Title IX investigation is not

discretionary but rather is mandatory.  *Id*. at 2.

172.    On May 1, 2014, as part of its aggressive enforcement policies following the issuance of

the "Dear Colleague" Letter, OCR published a complete list of 55 higher education institutions

nationwide that were then under investigation for possible Title IX violations.  As discussed below,

UMass Amherst was on that list.

173.    Numerous rights organizations have spoken out against the legal and financial pressure

exerted by OCR to force colleges and universities to find accused students (who are overwhelming male)

responsible, in spite of the evidence or the lack of evidence.  (*See*, *e.g*., Foundation for Individual

Freedom in Higher Education (FIRE), Stop Abusive and Violent Environments (SAVE), Families

Advocating for Campus Equality (FACE), and prominent Harvard and University of Pennsylvania Law

School faculty members asserting that OCR's new rules violate the due process rights of the accused).

174.    Recognizing the harmful results of the "Dear Colleague" Letter, in a speech on September

7, 2017, the Secretary of Education Betsy DeVos observed that "[n]o school or university should deprive

any student of his or her ability to pursue their education because the school fears shaming by – or loss of

funding from – Washington," and "no student should be forced to sue their way to due process, " and that

"[o]ne person denied due process is one too many." (*See Secretary DeVos Prepared Remarks on Title IX Enforcement*, https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement).Noting that "the era of 'rule by letter' is over" and that "[t]here must be a better way forward," the Education Secretary announced that the Department of Education would "launch a transparent notice-and-comment process to incorporate the insights of all parties" in an effort "to ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence[.]"  *Id.*

175.    Then, on September 22, 2017, the Department of Education announced that it was withdrawing the 2011 Dear Colleague Letter and the 2014 Questions & Answers, noting in part the criticism of those documents for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness."  (*See September 22, 2017 Dear Colleague Letter*, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf, at 1).

176.    Citing, in part, the Open Letter from 28 members of Harvard Law School's faculty criticizing Harvard's sexual harassment policy, the Department of Education warned on September 22 that as a result of the 2011 Dear Colleague Letter and the 2014 Questions and Answers, "many schools have established procedures for resolving allegations that 'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'"  *Id*. The University's Code (which guides the University's disciplinary action against John) is based on the University's interpretation of the now-rescinded 2011 Dear Colleague Letter and 2014 Questions and Answers.

177.    The new guidance from the Department of Education reflects a return to the original principles of Title IX, stating that an "equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively

evaluate the credibility of parties and witnesses, synthesize all available evidence – including both inculpatory and exculpatory evidence – and take into account the unique and complex circumstances of each case."  (*See September 2017 Q&A on Campus Sexual Misconduct,* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf, at 4).

178.    Despite the withdrawal of the problematic prior guidance, the Department's warning about the problems with that guidance, and the Department's issuance of guidance that better reflects the principles embedded in Title IX, Defendants failed to take any steps repair their own flawed Code in effect since July 1, 2016.

179.    The harm caused by the 2011 "Dear Colleague" Letter has impacted John and his life by causing UMass Amherst to disadvantage him on the basis of his gender.

### 3.    OCR's Investigations of UMass Amherst

180.    UMass Amherst, like many other colleges and universities across the country, had been publicly criticized by students and the media in recent years leading up to OCR's review for allegedly mishandling sexual assault allegations brought by female students.

181.    UMass Amherst was one of the first universities after the issuance of the "Dear Colleague" Letter to directly feel OCR's legal and financial pressure.  On June 30, 2011, OCR opened a compliance review into whether the University violated rules around the handling of sexual violence and harassment complaints.

182.    On May 1, 2014, UMass Amherst appeared on OCR's investigation list, as it was still under investigation by OCR three years after the compliance review had opened.

183.     A second OCR investigation of UMass Amherst was opened in May 2015.

184.    As of 2016, UMass Amherst continued to be listed as under continuing OCR investigation for both the 2011 review and 2015 investigation. (*See* https://www.boston.com/news/local-news/2016/01/13/campus-sexual-assault-tracker-shows-umass-amherst-has-the-longest-unresolved-

investigation).  On April 7, 2016, the Massachusetts Daily Collegian reported that "the University of

Massachusetts has the longest-running Title IX investigation on record, initially opened on June 30,

2011."  (*See* http://dailycollegian.com/2016/04/07/umass-the-subject-of-countrys-longest-running-title-ix-

investigation-on-record/ ).

185.    These investigations have been a public black eye and a source of considerable expense to

the University.

### F.    UMass Amherst Has Responded to Negative Press and OCR Investigations by Creating Policies and Procedures that Deliberately Discriminate Against Male Students in Violation of Title IX

186.    As alleged above, OCR has exerted tremendous legal and financial pressure on colleges

and universities across the country, including UMass Amherst, to make "radical" changes in the

procedures they use to address alleged student-on-student sexual misconduct.  At UMass Amherst, OCR's

legal and financial pressure has been tangible and ongoing.  As previously alleged, OCR opened a

compliance review and an investigation, including the longest-running OCR investigation in the country,

into the University's sexual misconduct policies and procedures.  The review and investigation could

result in OCR's cutting off Federal funding to UMass Amherst if OCR deems the University to be non-

compliant with OCR's 2011 "Dear Colleague" Letter and 2014 Questions and Answers guidance.

187.    The University also has come under fire from student activists and the media for its

perceived mishandling of sexual assault complaints both leading up to and during the long-running OCR

investigations.

188.    In response, starting in the spring of 2011 and continuing through the present, the

University has adopted and applied sexual misconduct policies and procedures both in the Code and in the

University's Title IX website pages and publications that lack the most basic elements of fairness and due

process, that are overwhelmingly stacked against accused students – who are almost always male – and

that directly contravene Title IX and regulations requiring colleges and universities to adopt sexual

misconduct procedures that are "prompt and *equitable*," and that *"[a]ccord[ ] due process to both parties involved*."

### 1.      Changes in the Code of Student Conduct in Response to 2011 Dear Colleague Letter

189.    On April 15, 2011, the University announced that its Special Commission on the Code of Student Conduct had recommended a "comprehensive revision" to the Code's sexual assault provisions. (*See* UMass news office article, available at http://www.umass.edu/newsoffice/article/special-commission-on-code-of-student-conduct-at-umass-amherst-recommends-changes).

190.    In the article cited above, the University stated the Special Commission had recommended that the revised Code should contain "[a] new and greatly expanded section on … sexual harassment … sexual misconduct, and relationship violence," "[c]hanges in the appeals process to allow the complainant to appeal a decision and to allow the Chancellor or designee to review sanctions under certain circumstances," and "[c]hanges in the composition, appointment process, and training of hearing boards …." *Id.*

191.    This "comprehensive revision" has been overwhelmingly disadvantageous in its treatment of accused students (who are almost always male).

192.    In earlier Codes, the parties participated in a full evidentiary hearing before an impartial Hearing Board, at which both the charged and complaining student had the opportunity to question each other, call and examine witnesses, and present and question other evidence.  These pre-2011 Codes expressly contained "procedural safeguards" permitting accused students to question any witnesses and information presented against them.

193.     All of that changed post-2011.  The University replaced the "full hearing" with a process in which the accused student has no opportunity to directly question the complainant, examine and cross-examine witnesses, present documents and other evidence, or question information presented against him.

194. The Hearing Board alone questions the parties and witnesses, and reviews written statements and documentary evidence submitted in advance of the hearing by the parties. And, although the accused student may submit written questions to the Hearing Board, the Board retains discretion whether or not to ask them.

195. Earlier Codes permitted an accused student found responsible for sexual misconduct to appeal on grounds that "the decision is unsupported by substantial evidence," and that the "sanction is unsupported by the charges and/or against the student's judicial history."

196. That too changed in the post-2011 period, during which the University eliminated those grounds for appeal, permits the complainant to appeal the imposed sanction, and permits the Vice Chancellor to impose a more severe sanction. These changes clearly put accused students – who are almost always male – at a severe disadvantage in the appeals process.

197. All of these Code changes – which subject accused students to less favorable treatment than their accusers – exist in the current Code under which John's case is being prosecuted.

### 2. The University Has Explicitly Adopted a "Survivor-Centered" Approach to Training Its Investigators and Conduct Hearing Board Members

198. In addition to these changes to the Code, in direct response to OCR's May 1, 2014 publication of the list of 55 colleges and universities under OCR investigation (including UMass Amherst), the University through its Title IX Office expressly adopted a "survivor-centered" approach to its oversight of sexual misconduct investigations and hearings.

199. On May 1, 2014, the same day OCR's list became public, the University announced it had begun a "partnership with the Center for Women and Community, whose goals were to provide support to *survivors of sexual assault* and offering sexual assault prevention education." (*See* https://www.boston.com/news/local-news/2014/05/01/umass-amherst-says-compliance-review-not-a-complaint-prompted-title-ix-investigation ) (emphasis added).

200. The University's Center for Women and Community's mission is "[t]o provide innovative and informed education, leadership opportunities, advocacy and support services that address the cause and impact of sexism and recognize multiple oppressions experienced by women." Coupling the University's Title IX response with the Center for Women and Community furthered the gender bias of UMass's Title IX program, as it operated from the premise that women at the University are impacted by sexism and multiple oppressions.

201. Also, on the same date, UMass Amherst's Vice Chancellor for Student Affairs and Campus Life publicly praised the White House task force on sexual violence for its "outstanding work in providing strategies to prevent sexual assault, respond compassionately to *victims* and *hold perpetrators accountable*." *Id*. (emphasis added). The Vice Chancellor added, "We fully support their work and we have already been actively engaged in implementing many of the best practices recommended by the task force." *Id*.

202. UMass Amherst's Executive Director of News and Media Relations also issued a public statement, in which he explained that the University's "student conduct code has been revised. … We've been very concerned with this; it's an issue here and across the country." (*See* http://www.masslive.com/news/index.ssf/2014/05/University_of_massachusetts_ha.html).

203. The institutionalized use of the terms "survivors" and "victims" by these University officials and spokespersons to describe sexual assault complainants, and the term "perpetrators" to describe accused students, presumes the allegations are true before they have been evaluated, and reflects an official bias by University decision makers in favor of complainants (who are almost always female and against respondents (who are almost always male). Focusing on an "issue here and across the country" meant that the rights of the individual to due process were to be sacrificed to a policy goal.

**(a)     The Training of Investigators Is Permeated with Gender Bias**

204.     The University, under the direction of Title IX coordinator Ferreira, has made sure that this same "victim" bias has been inculcated in its Title IX investigators and Student Conduct Hearing Board members.

205.     The University requires that the Title IX investigators from the Dean of Students Office are "specially trained to handle their investigations with s*ensitivity* and *respect* for *victim's* privacy," and that they not only *investigate* complaints but also "*provide support, advocacy, assistance, and connection to resources*" to sexual assault complainants.  (*See* http://www.umass.edu/titleix/reporting/my-reporting-options/if-i-want-investigation-who-will-handle-it) (emphasis added).

206.     That training is overseen by Ferreira and the Title IX Office, in conjunction with the UMass Center for Women and Community, "to ensure their involvement in the process is consistent with the *University's commitment to operating with trauma-informed practices*."  (*See* https://www.umass.edu/titleix/my-title-ix-rights) (emphasis added).

207.     The University states that the "survivor-centered response" of its investigators "[p]rioritiz[es] the emotional and physical safety of the *survivor*" and "balances the mandate to investigate reported assaults with a response that *empowers survivors to take back control of their lives*." (*See* http://www.umass.edu/titleix/title-ix-reporting-and-response) (emphasis added).

208.     The University's investigatory process treats the complainant's report and statements as presumptively credible and prioritizes its investigators' sensitivity to the complainant over accurate fact finding.

209.     By contrast, the University makes no comparable effort to train Dean of Students Office investigators to handle their investigations with sensitivity and respect for students accused of sexual assault (who are overwhelmingly male), or to provide support, advocacy, or assistance on their behalf.

210.    In a purported effort to protect the "survivor," the investigators are required and trained to "minimiz[e] the number of times a *survivor* tells the narrative of the assault," even if inconsistencies and anomalies in the complainant's story require multiple interviews to clarify the facts on a timely basis. (*See* http://www.umass.edu/titleix/title-ix-reporting-and-response; *see also* http://www.umass.edu/titleix/reporting/my-reporting-options/whom-should-i-report  ("In all cases, *survivors* will be asked to describe the incident to as few individuals as practicable and will not be required to unnecessarily repeat a description of the incident.")).  Due process concerns, and the notion an "equitable" investigations are cast aside in the process.

211.    By placing in one person and one entity – the investigator from the Dean of Students Office – the conflicting roles of *investigator* and *factfinder* on the one hand, and *supporter* and *advocate* for the complainant on the other hand, the University has created an irremediable conflict of interest that taints the investigative and fact finding roles with an intentional, institutional bias in favor of female complainants.

212.    The Code also permits the Dean of Students to conduct a sanctions hearing, Code § III(B), even though the Dean is also tasked with being the advocate of the accused.  This conflict further evidences the lack of gender equity and impartiality that permeates the entire investigatory process.

> **(b)    The Training of Hearing Board Members Is Permeated with Gender Bias**

213.    The University's institutional gender bias taints the hearing process, and is most evident in the training received by Student Conduct Hearing Board members.  Like the investigators, Hearing Board members must attend specialized training overseen by Ferreira and the University's Title IX Office, in conjunction with the UMass Center for Women and Community, so that members will "have a better understanding of trauma and the impact of trauma," and "will discuss strategies and considerations for

engaging in a conduct process that is sensitive to the needs of **survivors**." (*See*

https://www.umass.edu/cwc/our-events-1) (emphasis added).

214. Hearing Board training materials prepared by the Center for Women and Community

depict an advocate from the Center for Women and Community asking the complainant "Do you feel

comfortable being in the same room as the charged student? There are other options."

215. The training materials include sections, entitled "Trauma Timeline," "Trauma-Informed

Practices," and "Trauma-Informed Hearing Process," that are victim-focused, instruct SCHB members

that they should "minimize # of times student tells their story," and teaches members "how to ask

questions" that are "trauma-informed."

216. The focus is on how to question "the victim" in a manner that avoids "judgment or blame,"

as opposed to questioning the charged student or other witnesses. Sample questions contained in the

section on the Trauma-Informed Hearing Process are posed exclusively to a "victim" and not a "charged

student."

217. The training given to the investigators and members of the Hearing Boards is intended to

indoctrinate rather than to provide an impartial, balanced view, to create bias and sympathy in favor of

female "victims" and "survivors," and to create bias and animus against male respondents, who are

characterized as perpetrators and "hegemonic males."

218. To add to the unfairness of the process, the University's policies and procedures lack

transparency, are confusing, are often conflicting, and are difficult to find on the University's myriads of

website pages, much less understand, which contravenes OCR's 2001 Guidance requiring colleges and

universities to "give notice … of the school's procedure" and notice of "how it works."

219. The lack of clearly communicated policies and procedures leaves the accused student to his

own devices to try to understand his rights and what procedures will be applied.

220.     The University's procedures are infused with a presumption of guilt.  Throughout the University's Title IX and sexual misconduct website pages and publications, complainants are labeled as "victims" and "survivors" on the basis of having made a complaint, are presumptively believed, and are provided with resources and support not provided to students who have been accused of sexual misconduct.

221.     One such website states that the Title IX Coordinator or Designee "will provide [the ***victim*** of sexual violence] with a variety of support resources and accommodations" with "minimal impact and costs to ***survivors*** …." (*See* https://www.umass.edu/titleix/my-title-ix-rights) (emphasis added).  No similar provision of services is made to the accused student.

222.     Although the University's Title IX policies purport to provide the parties involved in sexual misconduct proceedings with a number of rights, including the right to "fair and prompt investigations" and a process that is committed to "due process" (*see* http://www.umass.edu/titleix), it is clear that the University's Title IX Office, in performing its training and oversight functions, is committed to protecting only "the needs of survivors."

223.     In a University website, titled "Stand Up: Helping Survivors of Sexual Misconduct," the University provides guidance to all members of the University community who hear about a sexual assault case. They are exhorted to "BELIEVE." They are instructed: "Don't question. Don't judge. Just believe and support"; "Never blame someone who has been abused or assaulted or try to minimize their experience"; "Never ask questions or say things like: 'Are you really sure that's what happened"; "There is no one right way for a survivor to respond after being assaulted or abused. Never interpret someone's emotions (or apparent lack of emotion) as evidence that sexual misconduct didn't occur." (*See* https://www.umass.edu/umatter/sexual-misconduct/stand-up).

224.     In connection with training scheduled for September 16, 2016 for Hearing Board members, the Center for Women and Community stated on its website that it "will provide UMass Conduct Board members with a better understanding of trauma …. Participants will discuss strategies and considerations for engaging in a conduct process that is sensitive to the needs of survivors." (*See* https://www.umass.edu/cwc/our-events-1).

225.     These training materials and guidance from the University are permeated with gender bias. Complainants, who are overwhelmingly female, are presumed to be "survivors" of sexual assault or abuse, and all University community members are told to accept the "survivor's" credibility and veracity regardless of whatever might have occurred.

### 3.     The University Has Further Cemented Its Institutional Bias by Creating an Overtly Discriminatory Men and Masculinities Center

226.     The University's institutional bias in favor of female complainants is most vividly evidenced by its creation of the UMass Men and Masculinities Center in May 2014 in direct response to OCR's public disclosure of UMass's inclusion on its investigation list.  The Center is overtly biased against men.  The University publicizes the Center on its official website.

227.     The UMass Men and Masculinities Center offers workshops and events with the goal of "[c]reating [h]ealthy [m]asculinities." (*See* https://www.umass.edu/masculinities/about/workshops-events).  Its official website makes the repulsive and overtly discriminatory statement that "[t]here is a growing body of literature suggesting ***that men who adhere to 'hegemonic masculinity' (or more traditional constructions of masculinity) are less likely to engage in health promoting behaviors, more likely to accept violence as part of the masculine norm, and more likely to engage in a range of unhealthy and risky behaviors including … [s]exual and relationship violence***."  (*See* https://www.umass.edu/masculinities/) (emphasis added).

228.    The Center's stated mission "is to support male student success and the development of masculinities that are healthy for individuals and communities at UMass Amherst and beyond from a male positive, multicultural, and pro-feminist perspective.  Within this charge and in collaboration with existing campus programs, offices and centers, ***the Center seeks to … interrogate and deconstruct traditional forms of masculinity*** …." *Id* (emphasis added).

229.    The Dean of Student's Office is closely aligned with the Center insofar as it refers male students who have violated certain University codes to the Center for work with the Center's Director.

230.    This University-sponsored organization presumes that men (but not women) will engage in "risky behaviors," that men (but not women) will engage in discriminatory behavior, including "sexual and relationship violence," and that men (but not women) need to be interrogated and deconstructed.

231.    The public statements made by University officials and spokespersons cited above, the changes made to the Code, the University's partnership with the UMass Center for Women and Community in training its investigators and Hearing Board members, and its creation of the UMass Men and Masculinities Center, with its biased depiction of male sexuality, reflect the University's concern with unfavorable press and its bowing to political pressures to resolve sexual misconduct complaints in favor of female complainants and against male respondents.  This was all done under the supervision of Ferreira with deliberate indifference to the federal constitutional and statutory rights of accused male students.

### 4.    The University Has Taken Additional Steps to Discriminate Against Male Students

232.     Showing how far the University has gone to deny male students a fair and impartial process, in a May 18, 2014 Memorandum of Law in Support of a Motion to Dismiss filed in another case in this Court, the University moved to dismiss a male student's Title IX claim on the basis that the "Dear Colleague" Letter did not afford the male students any rights since it was not subject to the notice-and-

comment rulemaking of a regulation and is mere guidance.  *See Doe v. Univ. of Massachusetts Amherst*, 3:14-cv-30143, Docket No. 18, at 13 n.15 (D. Mass. Nov. 18, 2014) .

233.    The University's Policy for Harassment, Non-Discrimination and Sexual Misconduct for Employees and Students prohibits "Discrimination Based on Disparate Treatment."  The policy defines "disparate treatment" as "treating some people less favorably than others …. Intent to discriminate is important and sometimes can be inferred from the fact of differences of treatment." (*See* http://www.umass.ed/eod/UMass%20Amherst%20DRAFT%20Equtiy%20GRievance).  The University is in violation of its own gender discrimination policy by providing support and resources to alleged victims of sexual misconduct (who are overwhelmingly female) and none to accused students (who are overwhelmingly male).

234.    From 2014 to June 2015 (the period following OCR's May 2014 publication of its list of 55 schools under investigation), the University retained the National Center for Higher Education Risk Management, a consulting firm which specializes in Title IX compliance, to act as a consultant.  By hiring this organization, an inference can be drawn that the University was more concerned about treating its Title IX obligation as a "risk management" function, rather than a due process function.

235.    The consultant's promotional literature represents that: "Part of our law practices represents colleges and universities, more than 75 of them, and we know higher education law inside and out.  We've trained more than 750 campus hearing boards.  We have written more than 85 campus codes of conduct.  Our model sexual misconduct policy is the most commonly used model for colleges and universities.  When choosing an equity consultant to help guide your school or college through the process, having our insider expertise can make all the difference.  We assist campuses frequently in meeting requirements set out by OCR, DOJ and other government agencies through resolution

agreements.  We also provide continued compliance assistance through government monitoring periods that often accompany such resolutions."  (*See* http://www.equityconsultant.org).

236.    Rather than independently evaluate the procedures to ensure their fairness to all students, the University hired a consultant and undertook an approach that has led to an onslaught of prosecutions of male students across the country, and to the University's deeply flawed procedures.

### G.    The University's Policies and Procedures Violate Due Process Requirements Under 42 U.S.C. § 1983 and the Fourteenth Amendment

237.    In addition to engaging in gender discrimination in violation of Title IX, the University has violated the due process clause of the U.S. Constitution by failing to give John adequate notice of the prohibited conduct and an adequate opportunity to be heard.  The University has set forth a hodgepodge of overlapping, confusing, and often conflicting policies and procedures governing complaints of sexual assault and other sexual misconduct on several different University-maintained websites and publications.

238.    These websites and publications, when read individually and collectively, wholly fail to give students like John who have been accused of sexual assault a clear understanding of what their rights are, and what standards, policies, and procedures will be applied to their case.

239.    To the extent it is possible to make any sense of the jumble of policies and procedures, one overarching, unifying theme emerges – the University's system of resolving sexual misconduct complaints is completely skewed in favor of female complainants and against the rights of accused male students.

240.    These publications and websites include:

- The 2016-2017 Code that provides the outlines of a disciplinary process managed by the Dean Of Students Office (*see* https://www.umass.edu/dean_students/sites/default/files/documents/2016-2017%20Code%20of%20Student%20Conduct.pdf );

- a website entitled "Title IX at UMass Amherst" that provides for "fair and prompt investigations" of complaints of "sexual harassment," "sexual violence," and "other

sexual misconduct," to be "manage[d]" by the "UMass Amherst Title IX Coordinator" (*see* http://www.umass.edu/titleix; https://www.umass.edu/titleix/my-title-ix-rights; *see also* https://www.umass.edu/titleix/title-ix-team ("In her role as Title IX Coordinator, Débora [Ferreira] is responsible for overseeing the investigation of Title IX related complaints, including sexual harassment, sexual assault, relationship violence and stalking" and for "chair[ing] the Title IX Team, which coordinates responses to Title IX incidents."));

- a document, entitled "Sexual Harassment Policy and Procedures," that provides students complaining of "sexual harassment," including "uninvited physical contact" with the right to an investigation by the University's Office of Equal Opportunity and Diversity ("EO&D") (*see* http://www.umass.edu/eod/SexualHarassmentPolicy.pdf).

### 1.    The Code's Unclear Statements About Jurisdiction

241.    The Code states that its "jurisdiction" is "to student conduct which occurs at the University of Massachusetts Amherst or on the grounds of the other four colleges within the Five College Consortium (Smith College, Amherst College, Hampshire College, Mount Holyoke College) or at any event sponsored by any of these institutions," Code § I(A)(3), yet the University is applying the Code in John's case to conduct that occurred entirely off-campus, outside of University-owned housing.  A student reviewing the Code does not receive adequate warning that the Code applies to off-campus conduct.

242.    At a minimum, the Code is ambiguous as to whether it applies to off-campus activities, depriving students of fair notice.  As stated above, ambiguities should be construed against the sophisticated draftsperson in such a way that the Code does not apply to off-campus conduct that does not impact academic issues.

243.    While the Code also says: "the University reserves the right to take action based on any student conduct, regardless of location, that is contrary to the pursuit of the educational mission of the University or that may adversely, distinctly or directly affect the University community," the University has made no such showing of such an impact.  As this jurisdiction section was obviously drafted with the

goal of limiting the University's responsibility for off-campus conduct, having chosen to limit its

responsibility through its written Code, the University cannot also say the Code applies off-campus.

> **2.      The Code's Inconsistent Definitions of Sexual Misconduct, Sexual Harassment, and Consent**

244.    The Code purports to provide "definitions" of "sexual misconduct," "consent" and conduct

that is "not consent," but also contains an express disclaimer cautioning students that the Code gives them

only "general notice and examples of prohibited conduct," and that "[t]he descriptions should be read

broadly and are ***not designed to define expectations or misconduct in exhaustive terms***." Code §

I(E)(1)(emphasis added).

245.    The University effectively reserves the right to define these terms differently in its

discretion without notice.  Thus, conduct not set forth in the Code's definitions could nevertheless be

found by the University to constitute sexual misconduct, sexual harassment, or lack of consent in a

University disciplinary proceeding.

246.    The Code defines "[s]exual misconduct" as: (i) Engaging in a sexual act with another

person: (a) by forcing the other person to participate in a sexual act without consent or by threatening or

coercing the other person, or (b) by placing the other person in fear that any person will suffer imminent

bodily injury, or (c) having substantially impaired the ability of the other person to appraise or control

their own conduct by administering or employing alcohol or other drugs without the knowledge or against

the will of the other person"; or (ii) Engaging in a sexual act with another person when that other person:

(a) is incapable of understanding, or for any reason including intoxication, is unaware of the sexual act, or

(b) is physically incapable of resisting or communicating either consent or unwillingness to participate."

*Id*. § V(B)(2)(b).

247.    The Code defines "[c]onsent" as "informed, freely, and actively given, mutually

understandable words or actions which indicate a willingness to participate in mutually agreed upon

sexual activity," and provides that "[c]onsent may be withdrawn"; "may never be given by ... those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary), or those who are unconscious, unaware or otherwise physically helpless, or in need of medical attention as a result of alcohol consumption or any other cause," and that "[a]greeing to a sexual act as a result of coercion, intimidation, threat of force, or force is not consent." *Id.* § V(B)(2)(c)(ii).

248.   The University sets forth a different, more detailed definition of consent and incapacitation in a separate Grievance policy on the University's Title IX webpage addressing student conduct that focuses on what a reasonable person observing the condition of the reporting party would have known. (*See* "Policy For Harassment, Non-Discrimination And Sexual Misconduct For Employees And Students,"

http://www.umass.edu/eod/UMass%20Amherst%20DRAFT%20Equity%20Grievance%20Policy.pdf .

249.   This separate policy definition states as follows: "Sexual activity with someone you know to be or should know to be incapacitated constitutes a violation of this policy.  Incapacitation can occur … as a result of voluntary or involuntary alcohol or other drug consumption.  Incapacitation is a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of their sexual interaction).  ***The question of what the responding party should have known is based on what a reasonable person in the place of the responding party, sober and exercising good judgment, would have known about the condition of the reporting party.***" *Id*. at 8 (emphasis added.)

250.   This "reasonable person" provision appears in the University's Title IX website but not in the Code.  These inconsistent standards violate due process, as there can be no fair procedure unless it is clear that the "reasonable person" standard in the Grievance policy is part of the Code's governing standard.

### 3.    The Code's Conflicting Provisions Regarding the Impact of Alcohol Use

251.    The Code does not state whether this non-Code definition of consent and incapacitation would be applied in a student disciplinary proceeding or whether the Code's definition of consent and incapacitation would be applied in such a proceeding.

252.    The Code also contains conflicting standards about student responsibility for the consequences of alcohol consumption.

253.    One section of the Code, entitled "Self Safety," holds each student responsible for his or her own actions which result in "[b]eing unable to exercise care for one's own safety because one is under the influence of alcohol." Code § V(B)(4)(c).

254.    This "self safety" provision conflicts with another Code provision providing that "[a]ny behavior which may have been influenced by a student's … voluntary use of drugs or alcoholic beverages shall not in any way limit the responsibility of the student for the consequences of her or his actions." *Id.* § I(H)(1).

255.    In this provision of the Code, the University treats voluntary consumption of alcohol by complainants and accused students involved in the conduct process differently.  The Code effectively absolves complainants of poor decision-making for their voluntary consumption of alcohol while holding accused students responsible for their decisions while under the influence of alcohol.

### 4.    The Code's Flawed Procedures with Respect to Notice and Investigation

256.    The University purports to guarantee students accused of sexual misconduct or harassment with procedural due-process "rights" or entitlements, including an investigation, but the procedures are internally inconsistent and contradictory and allow the Dean of Students Office broad discretion to dispense with an investigation.

257.    The Code does not even require an investigation, just a "review," despite OCR's 2001 Guidance (which has been and continues to be the law), requiring colleges and universities to conduct an

"adequate, reliable, and impartial investigation, including the opportunity to present witnesses and other evidence."  (*See* http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf, at 20).

258.    The Code states "the University *may* investigate an allegation of student misconduct.  The *review may* include interviewing relevant students, witnesses, review of document[s] or other steps that will assist the Dean of Students Office to determine whether charges are warranted." Code § II(B)(1)(a)(emphasis added).  This indeterminate investigatory standard leaves it wholly to the discretion of the Dean of Students Office whether to conduct any investigation or simply to rely on the complaint and statements of the complainant.

259.    This vague investigatory standard has resulted in the failure by Defendants to comply with the "prompt and equitable" standard of Title IX by prolonging the investigation well over three times the length of OCR's 60-day recommendation and by scheduling a hearing after graduation on an empty campus where witness availability is virtually a nullity.  This conduct has also deprived John of constitutional rights to due process.

260.    John received only a modicum of information from Ward relating to the charges, including what appear to be cherry-picked text messages that Jane Roe provided to Ward, without any clarification from Ward or Cardoso-Erase whether she has provided all relevant text messages or whether the University has requested that all relevant text messages be provided.

261.    As a matter of due process and fundamental fairness, John is entitled to all exculpatory evidence, all evidence in the University's possession concerning the circumstances of the preparation of the Public Report, and all evidence pertaining to the charges and accusation.

262.    The Code does not require its investigators (and in John's case did not require Ward) to interview all relevant witnesses, obtain and review all relevant documents, or retain experienced, neutral scientific experts to examine and opine on the level of Jane Roe's intoxication, her claimed loss of

memory, the role of alcohol, drugs, or prescription medication on her claimed loss of memory, and the nature of alcohol or drug-induced "black outs" (including whether persons experiencing such "black outs" or loss of memory episodes appear to persons observing them to be normal by all objective criteria – *e.g.*, no slurring of speech, no staggering or falling, no confusion as to whereabouts and actions).

263.    In a fair and thorough investigation, the University's investigator must (but in John's case did not) obtain and examine key items of physical and documentary evidence, such as any relevant video footage, social media posts, cell phone texts, text messages, phone data, and photographs, that could exculpate John.

### 5.    The Code's Flawed Hearing Process

264.    The Code contains inconsistent and contradictory provisions concerning an accused student's opportunity to be heard at a hearing.

265.    A Hearing Board is composed of "not fewer than three, nor more than five members" recruited from University staff and students.  SCHB members are appointed by the Dean of Students. Code § III(B)(1).  OCR guidance, however, says that students should not serve on panels hearing sexual misconduct cases.

266.    The Code states in one provision that "[a]t the end of the Conduct Conference ... [i]n cases which ***may result*** in expulsion, suspension, or removal from housing imposed or deferred, the matter ***may be referred to a Conduct Hearing Board***." *Id.* § II(B)(4)(a) (emphasis added).

267.    But in another provision, the Code states that "[i]n cases which may result in expulsion, suspension, and/or removal from housing … and where the student(s) or group of student(s) and the Dean of Students Office staff cannot agree on the facts and/or sanctions, the matter ***will*** be referred to a Hearing Board." *Id.* § II(B)(4)(a)(vi) (emphasis added).

### 6.     The Code Improperly Limits the Rights of Students to Defend Themselves at the Hearing

268.     The Code provides that the Hearing Board does not follow "the rules of evidence or standard of proof found in criminal or civil proceedings," Code § I (C)(3), but does not provide accused students with notice of the rules or procedures that will be applied at the hearing.  *Id.* § III(D)(6) ("A Hearing Board follows prescribed procedures, but need not observe the rules of evidence observed by courts, and the presiding officer may exclude unduly repetitious or irrelevant evidence.").

269.     The Code contains inconsistent and contradictory provisions about what evidence the Hearing Board may rely on in reaching its decision.

270.     While Code § III(D)(5) provides that the Hearing Board "may rely upon oral statements of witnesses and upon written reports and other documents," Code § III(D)(7) provides that the Hearing Board "may take notice of matters which would be within the general experience of University students or officials."

271.     While both the complainant and the accused student may access assistance of a non-attorney advocate from the University community to represent him or her, *id.* § III(A)(1), the Code does not permit the accused student to have an attorney present at the hearing unless "there is a pending criminal case or when there is a reasonable likelihood that a criminal complaint will be sought against the student(s) arising out of the same facts as the charge(s)." *Id.* § III(A)(1) & (2).

272.     This restriction on access to an attorney violates the Violence Against Women Reauthorization Act of 2013, and implementing regulations, which have the force and effect of law, under which "the accuser and the accused are entitled to have others present during an institutional disciplinary proceeding, including ***the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice*** (23 U.S.C. § 1092(f)(8)(B)(iv)(I)-(II) (emphasis added)), "which includes an

attorney." (79 Fed. Reg. 62774; *see also* 34 C.F.R. § 668.46(k)(2)(iv) (a school may "[n]ot limit the choice of advisor … in any meeting or institutional disciplinary proceeding")).

273.    Even where the accused student is accompanied by an attorney, the Code does not permit the attorney to participate in the hearing in any way, even if the charges are serious enough to warrant suspension or expulsion or criminal charges being filed. Code § III(A)(2).

### 7.    The University Provides Inadequate Notice of the Procedures to Be Followed at the Hearing

274.    The Code does not provide the accused student with notice of the specific procedures to be used at the hearing.

275.    A document published by the Dean of Students Office, entitled "Student Conduct Hearing Board Procedures" ("Hearing Board Procedures"), provides accused students with an outline of information about the Hearing Board procedures.

276.    The Hearing Board Procedures state that a Dean of Students Office staff member will contact the recipient student via student email to schedule a hearing.  Although Dean Connary sent John an email about having either a combined hearing with another student, or a separate hearing, neither he nor anyone else from the Dean of Students Office contacted John Doe about actually scheduling the hearing.

277.    The Hearing Board Procedures do not specify the procedures to be used at the hearing but provide only the following bulleted outline of the sequence of events:

- Greeting and Introductions
- Review of Procedures
- Review of Information Received
- Review of Case Information
- Break
- Final Statements
- Final Questions
- Closing of the Hearing

278.    According to the Hearing Board Procedures, the Chair of the Hearing Board then leads the deliberation process, which is conducted in private and remains confidential. Code § III(D)(10).

279.    Another University document, titled "Student Conduct Hearing Board Agenda" ("Hearing Board Agenda"), describes a process for conducting a Conduct Hearing.

280.    The Hearing Board Agenda does not state that a Hearing Board is required to follow all of the steps set forth in the agenda.

281.    The Hearing Board Agenda contemplates that the parties will submit questions in advance of the hearing to the Hearing Board, and that the Board "will consider them during questions."

282.    Although the Agenda contemplates that the Hearing Board will ask the complaining witness and the accused student whether they "feel that all questions submitted have been addressed[,]" the Agenda does not require the Board to ask all, or even any, of the questions submitted by an accused student.

283.    The Hearing Board Agenda does not provide the accused student with the right to directly question the complaining witness or other witnesses during the hearing.

284.    The Code states that a hearing "follows prescribed procedures," *id*. § III(D)(6), but does not provide an accused student with adequate notice of the procedures that will be used at the hearing.

285.    The Code does not permit the accused student to have an attorney present at the hearing unless there is a pending criminal case or reasonable likelihood that a criminal complaint will be sought against the accused student, *id*. § III(A)(1) & (2), and fails to define on what basis "a reasonable likelihood that a criminal complaint will be sought" is determined in violation of the Violence Against Women Reauthorization Act of 2013 and its implementing regulations.

286.    A student without legal training cannot reasonably be expected to litigate against a University that constantly prosecutes similar cases, particularly where there are complicated, fact-specific,

highly contested, and scientifically-based concepts like "capacity" and "consent" that would lie at the heart of any hearing.

287.    With so much at stake, it is fundamentally unfair to force an untrained student to try these issues on his own.  That would be true regardless of the procedural rules in place, but is particularly true here, where all the procedural rules overwhelmingly favor the accuser.

288.    Even where the accused student is permitted to be accompanied by an attorney to the Hearing, the Code and Hearing Board Agenda do not guarantee the accused student the right to have his attorney participate as an advocate in any way, even if the charges are serious enough to warrant suspension or expulsion, or in circumstances where the accused student is exposed to possible criminal charges being filed.

289.    Indeed, both the Hearing Board Procedures and Hearing Board Agenda that were sent to John Doe on October 6 expressly state that although a charged student may have an advisor, including an attorney, present for the hearing process, that person "may only act in an advisory capacity and may not represent [him] or otherwise participate in the hearing."

290.    Due process is not satisfied by requiring a young undergraduate student to play lawyer.  Persons are entitled to assistance of counsel in all manner of administrative proceedings.  These draconian restrictions placed on the ability of accused students like John to defend themselves violate due process and fundamental fairness, especially given the serious nature of the allegations and the possibility of severe punishment.

291.    The Code provides that the Hearing Board does not follow "the rules of evidence or standard of proof found in criminal or civil proceedings," *id*. §I(C)(3), but does not provide accused students with notice of what rules of evidence shall apply at the hearing for the submission of evidence.

292.     The University does not guarantee students the right to present an opening statement; the right to obtain, compel, and present the testimony of critical witnesses in their defense, including witnesses with personal knowledge of relevant events, character witnesses, and forensic experts; or, the right to confront and cross-examine their accusers, even if the charges are serious enough to warrant suspension of expulsion, or in cases where the accused student is alleged to have engaged in serious criminal conduct involving sexual misconduct.

293.     The inability of accused students like John to cross-examine their accusers or present defense witnesses is particularly unfair when (as here) the case essentially turns on the credibility of the accuser.  The inconsistencies in the accuser's story lie at the heart of this case.  Due process requires that a respondent be permitted reasonable cross-examination by an experienced examiner.

294.     The apparent inability of accused students like John to submit expert testimony is particularly unfair when (as here) the case involves scientific issues of capacity to give consent, the complainant's level of intoxication, the possible role of alcohol, drugs, or prescription medications on memory loss or "black outs," and the nature of alcohol or drug-induced "black outs."

295.     In cases where a complainant subsequently claims after the fact to have experienced a loss of memory or "black out" as a result of voluntary alcohol consumption, the outcome often turns on whether the complainant nonetheless was fully aware of what she was doing at the time and fully capable of consenting, especially where there is evidence that the complainant appeared to those observing her to be acting normally by all objective criteria – *e.g.*, no slurring of speech, no staggering or falling, no confusion as to whereabouts and actions.

296.     The University does not provide for a higher standard of proof than "preponderance of the evidence," even in cases where the charges are serious enough to warrant suspension or expulsion, or in

cases where the accused student is alleged to have engaged in serious criminal conduct involving sexual misconduct.

297.    The Code provides that the Hearing Board "shall make the determination of whether or not the student is responsible for any of the charges," but is authorized to make this decision on no more than "a preponderance of the evidence," even where the accused student is facing suspension or expulsion.  *Id.* § III(D)(4) & (9).

298.    The Code contains internally inconsistent and contradictory provisions about who bears the burden of proof at the hearing.  Code § I(C)(3) provides that "[t]he burden of proof shall at all times rest upon ***the complainant***."  But, Code § III(D)(4) provides that ***"[t]he University*** shall bear the burden of proving the elements of the contested charge(s) by a preponderance of the evidence." (Emphasis added).

299.    Notwithstanding the federal regulations that a "prompt, fair, and impartial proceeding" includes a proceeding that is conducted by "officials who do not have a conflict of interest or bias for or against," the parties, 34 C.F.R. 668.46(k)(3)(i)(C), there is no opportunity to challenge bias or competency of Hearing Board members, and there is no procedure to challenge the adequacy or impartiality of the training a Hearing Board member undertook.

### 8.    The University Uses an Unfair Decision Making Process

300.    The Code provides that the Hearing Board shall, within two business days, issue a report that includes "a written summary of testimony, findings of fact(s), and rationale." Code § III(D)(12).

301.    The Code provides that a "designated University official shall, within five business days after receiving the Hearing Board's report, render a written decision in the disciplinary matter, consisting of findings of fact, sanction(s), and reasons therefore [sic], which shall be included in the record." *Id.* § III(D)(13).

302.     The Code does not identify the designated official who will make these decisions, nor does it specify what rules of evidence or procedures or what quantum or standard of proof that official will use in deciding whether to approve the Hearing Board's decision and impose sanctions.

303.     Even though the Code states that this unidentified official will decide sanctions, the Code also permits the Dean of Students or her or his designee(s) to "conduct a sanctions hearing." *Id.* § III(B)(2).  The Code does not state under what circumstances the Dean of Students may conduct such a hearing, or what procedures will be used at the sanctions hearing.

### 9.     The Code Does Not Provide Fair Appeal Procedures

304.     The Code provides that, within five business days, an accused student may appeal the decision of the unidentified University official to a University Appeals Board ("UAB"), consisting of "three University employees and/or students" appointed by the University's Chancellor or his or her designee.  Code § IV(A) & (B).

305.     The Code provides that "[i]n cases involving sanctions of suspension of more than ten days or expulsion, this [appeal] letter may be submitted by an attorney."  *Id.* § IV(B).

306.     The Code permits a complainant to file an appeal "[i]n cases involving violence or non-forcible sexual misconduct."  *Id.* § IV(D).

307.     The Code allows an accused student to appeal only if the appeal letter "specifically alleges and factually supports" one or both of the following: (1) "[a] procedural error or irregularity that materially affected the decision," or (2) "[n]ew evidence that was not reasonably available to the appealing party prior to the hearing which would have materially affected the decision . . . ."  *Id.* § IV(B)(1) & (2).

308.     The Code does not permit an accused student to appeal on grounds that the findings of the Hearing Board are against the weight of the evidence or that the sanction imposed by the SCHB is disproportionate to the finding.

309.    The Code provides that "[i]f a sufficient claim is presented under one or more specified grounds," the UAB "shall review . . . the hearing records."  *Id*. § IV(C).

310.    "A recommendation from the UAB may include, but not be limited to, changes in sanction(s), or remanding to a new Hearing Board."  *Id.*

311.    The Vice Chancellor for Student Affairs and Campus Life reviews the UAB's report and recommendation and issues a decision.  *Id.*

312.    The Code allows the Vice Chancellor discretion to impose a more severe sanction, which is final and unreviewable.  It states that Vice Chancellor "***is not limited to those sanctions imposed by the Dean of Students Office or to those recommended by the UAB even though such decisions may result in the imposition of more severe action***."  *Id*. (Emphasis added). That decision shall in all but "exceptional cases" be "final."  *Id*. §IV(E).

313.    The Code provides that "[i]n exceptional cases in which the Chancellor or designee determines that the safety or wellbeing of the campus community warrants, the Chancellor or designee may use professional discretion or upon the request by an involved party, review the decision of the University official."  *Id.* § IV(F). The Chancellor or designee" may refer the case back to any level for further review, may affirm the decision, or may overturn the decision," in which case that decision "shall be final."  *Id.*

314.    The University does not specify under what circumstances an accused student may appeal the Vice Chancellor's decision to the Chancellor of the University.

315.    The Code's appeals process violates due process because it does not permit an accused student to appeal on the basis that the Hearing Board's decision is not supported by the weight of the evidence or the sanction is disproportionate to the finding, and it allows the final appeal decision maker to

impose a more severe sanction, which is unreviewable and final, making the right to an appeal illusory and allowing the University to subject the accused student in effect to double jeopardy.

316.   Other defects in the appeals process further deprive John of due process.

317.   The Code provides that a "designated University official" will render a written decision, but it does identify the designated official who will make this decision, nor does it specify what rules of evidence or procedure or what quantum or standard of proof that official will use in deciding whether to approve the Hearing Board's decision.

318.   In the event of an appeal brought by a complainant, the Code does not provide for the accused student to receive a copy of the complainant's appeal papers, nor does it provide that the accused student will be permitted to file a response to any such appeal.

319.   The Code provides that the Vice Chancellor will review the UAB's report and recommendation and will render a decision in the case, or may request the UAB to "clarify its recommendation," after which the Vice Chancellor will "decide the matter." *Id*. § IV(E).  But to the extent that clarification is sought by the Vice Chancellor, the Code does not provide for notice to an accused student of a request for clarification or the opportunity to respond to a request for clarification.

### 10.   Ward and Cardoso-Erase Had Conflicted Positions in Dual Roles as "Investigators" and Advocates for the Complainant and Ferreira Failed to Provide the Necessary Oversight

320.   The University's unfair procedures utilized by Ward and Cardoso-Erase are a direct outgrowth of the conflicted positions they occupy.  The University's Title IX policies require investigators in the Dean of Students Office not just to investigate sexual assault reports but to "provide support, advocacy, assistance, and connection to resources" to the "victim." (*See* http://www.umass.edu/titleix/reporting/my-reporting-options/if-i-want-investigation-who-will-handle-it).

321.   By placing in one person and one entity – a single investigator from the Dean of Students Office – the functions of conducting an investigation ***and*** supporting and advocating for the complainant,

the University and Ferreira as Title IX coordinator created an irremediable conflict of interest that has tainted the investigative and fact finding roles with an institutional bias against male respondents like John in this case.

322.    Given the investigator's role as advocate for the alleged victim, he or she has an irreconcilable conflict in attempting to conduct an impartial investigation.  Notwithstanding this obvious conflict in the investigative process, on information and belief, Ferreira played no role in the investigation in this case, failed to exercise oversight of the investigation by Ward to ensure it comported with the requirements of Title IX, abdicated investigative responsibility entirely to Ward, and failed to take any steps to ensure the fairness of the investigation.

323.    While the University's Title IX's published policies provide for oversight by the Title IX Coordinator – herself an experienced attorney, the investigative function was actually left to Ward, who lacks legal training and the necessary expertise to serve as a Title IX investigator.

## 11.    The Code Misleadingly Describes Its Purpose as Educational When It Is in Fact Punitive

324.    The Code states that its "purpose is to reinforce and encourage the development of good decision-making and personal integrity and to teach these skills where they are lacking." Code, *Preface.*

325.    The University also claims that "[i]t is the University's goal that as students make their way through any aspect of the conduct process, they will leave that process as better educated students, better members of the University community, and better global citizens." *Id.*

326.    In fact, the University's wholly unfair process deprives students of education, subjects them to severe and arbitrary punishment, diminishes their standing in the community, and harms them as global citizens, as they are forced to defend themselves against a fundamentally unfair system.  It is grossly unfair to lure students to the University and to persuade them to participate in such proceedings based on the false promise that its disciplinary system serves a higher educational purpose.

327.     It is likewise misleading for the University to claim that its Code seeks to "encourage the development of good decision-making and personal integrity."  This would be true only if there were a fair and unbiased system of adjudicating sexual misconduct complaints.

> **12.     The Code Presumes that an Accuser's Allegations are Truthful and Imposes No Penalty for a False Accusation**

328.     Under the Code, all members of the community are "expected to" "refrain from filing complaints in bad faith."  Code § II.  There is, however, no prohibition from or penalty for a bad faith filing.

329.     This "expected to" language proceeds from the premise that false accounts of sexual assault do not exist or are rare, and has the effect of fostering bad faith filings.  It appears intentionally designed to allow female students to bring baseless charges against male students without penalty, and discriminates in favor of the accuser against the accused.

330.     Although the Code states that the "functions of a University depend on honesty, integrity, and civility," *id*. § II(C)(1), there is no penalty for bringing a false accusation, belying the claimed importance of "honesty" and "integrity" and making the Code misleading.

331.     The University's policies on reporting requirements also offend due process.

332.     The Sexual Misconduct page at the UMatter at UMass website states: "If you become aware of a potential incident of sexual misconduct, relationship violence, or other violence or harassment, it is important to promptly bring it to the attention of the Dean of Students Office." (*See* http://www.umass.edu/umatter/sexual-misconduct).  But there is no corresponding command to report a false accusation of sexual misconduct.

333.     The University's procedures for its employees make it sanctionable, and can potentially lead to termination, if an employee files a false accusation.  The fact that the University has a completely

63

different standard for students charging sexual misconduct (almost all female) shows the discriminatory nature of this rule.

334.    These procedures favor the accuser, fail to protect the rights of the accused, proceed from the assumption that the accuser is telling the truth, or at least more likely to be telling the truth than the accused, and contravene principles of due process.

## COUNT I
**Federal Civil Rights Act, 42 U.S.C. § 1983,**
**Violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment**
**(Against Defendants Ward, Cardoso-Erase, and Ferreira**
**in Their Individual and Official Capacities)**

335.    John incorporates by reference the foregoing paragraphs as if fully set forth at length and incorporates Count II below, because the deprivation of rights under a federal statute such as Title IX gives rise to a claim against officials for violations of 42 U.S.C. § 1983.

336.    42 U.S.C. § 1983 creates a private cause of action for persons who are denied a federal constitutional or statutory right by a "person" acting under color of state law.

337.    The Fourteenth Amendment to the U.S. Constitution provides that no state shall deprive any person of life, liberty, or property without due process of law. Procedural due process protects an individual from deprivations of protected interests that are unfair.

338.    The Fourteenth Amendment to the U.S. Constitution also provides that no state shall deprive any person of the equal protection of its laws. Gender discrimination by a state University constitutes a violation of the equal protection clause.

339.    At all times material to this Complaint, UMass Amherst, as a public University organized and operated by the Commonwealth of Massachusetts, was a state actor.

340.    At all times material to this Complaint, Ward, Cardoso-Erase, and Ferreira were acting under color of Massachusetts state law.

341.     John's rights to due process and equal protection are guaranteed to him by the Fourteenth Amendment to the U.S. Constitution.

342.     The due process rights conferred by the Fourteenth Amendment are implicated by higher education disciplinary actions, procedures, and decisions, including the disciplinary action taken against John by UMass Amherst and its officials.

343.     John also has federal statutory rights under Title IX.

344.     UMass Amherst is obligated under the Fourteenth Amendment to provide John with due process and equal protection in its disciplinary actions and decisions.

345.     Ward, Cardoso-Erase, and Ferreira, acting under color of state law and in their individual capacities, violated John's constitutional rights to due process by failing to provide him with adequate notice, and a fundamentally fair and reliable investigation, hearing and decision process.  They also deprived him of equal protection under the laws, and deprived him of his federal statutory rights under Title IX as outlined in Count II below.  They acted intentionally, willfully, recklessly or with callous and deliberate indifference to John's constitutional rights.

346.     Defendants are seeking to further deprive John of due process rights.  Even though the Code indicates that it applies only to current enrollees, defendants seek to apply it to John.  That constitutes a violation of due process, as it amounts to the state taking away property and liberty interests in an arbitrary and capricious manner without providing notice of when rights are subject to forfeiture.

347.     Defendants stripped John of constitutional rights to a fair hearing by intimidating and retaliating against witnesses.  They violated his due process rights by imposing arbitrary, unfair, and prolonged interim restriction that resulted in significant harm to his property and liberty interests; damaged his reputation; and caused him to suffer humiliation, all without any hearing and without full consideration of, and explanation for, such onerous restrictions.  Defendants also violated John's

constitutional rights by depriving him of a degree in contravention of the University's regulations and without a hearing. Defendants further violated John's constitutional rights with impunity, informing him that information about such proceedings would be confidential and then revealing it without condition to Jane Roe's friend, who is not a member of the University and therefore not subject to any sanction for revealing confidential information.

348.    The University's sexual misconduct policies and procedures, as written and as implemented in John's case, violate fundamental due process requirements. The lack of due process infects the entire process, including wholly inadequate notice, investigation, hearing, and appeals procedures.

349.    Complainants need only prove their accusations by a preponderance of the evidence, and are presumed to be "victims" and "survivors" of sexual assault merely for having brought a complaint. The accused student is presumed to be responsible for the alleged assault, and effectively has the burden of proving his innocence.

350.    The University's subjecting John to jurisdiction violates the plain language of the Code, which states that it applies on the UMass Amherst and on the campuses of certain other universities. The University thereby implicitly disclaimed responsibility for overseeing off-campus activities.

351.    The Code is deliberately misleading when it claims its purpose is "educational," when its real purpose is to bend to the OCR and press pressure that pushes the University to mete out more punishment to male students.

352.    John has a significant and substantial liberty and property interest in avoiding an unfair or erroneous decision and/or sanction, in maintaining his good academic, professional and personal reputation, and in avoiding social stigma.

353.    As a result of the actions of Ward, Cardoso-Erase, and Ferreira, John's constitutionally protected rights to due process and equal protection and his statutory rights under Title IX have been, and continue to be, violated.

354.    John's reputation has been harmed and will continue to be harmed as a result of defendants' ongoing violation of his constitutional and federal statutory rights.

355.    As a direct and proximate result of Ward's, Cardoso-Erase's, and Ferreira's violations of John's due process rights, he has suffered severe and substantial injury.

356.    This injury includes substantial monetary damages.  John was not permitted to participate in University-sponsored activities, including graduation.  John suffered public humiliation and suffered significant embarrassment by being precluded from commencement ceremonies.  John also could not attend University-sponsored activities for more than the entirety of his last semester at school, which deprived him of the value of his education and tuition.  The failure of the University to provide updates on the proceedings was a constant source of anxiety and resulted in further damages.  The University's retaliation against John's fraternity was another stress source and caused further economic damage. Likewise, the revealing of John's confidential information caused economic damages.  The ongoing proceedings are an impediment to John's continued pursuit of his career, which has resulted in damages yet to be determined and presently incalculable.

357.    John also is entitled to punitive damages because the Defendants' conduct involved intentional, reckless or callous indifference to John's federally protected rights.

358.    Pursuant to 42 U.S.C. § 1988, John is entitled to his attorneys fees incurred in bringing this action.

<u>COUNT II</u>
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.***
**(Against Defendant UMass Amherst)**

359.    John incorporates by reference each of the above paragraphs as if fully set forth herein.

360.    Title IX prohibits discrimination based on sex in education programs and activities receiving Federal financial assistance.  20 U.S.C. § 1681, *et seq.* "Discrimination" means "differential treatment" or "less favorable treatment."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005).

361.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.

362.    UMass Amherst is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

363.    UMass Amherst discriminated against John and deprived him of the benefits of its education program on the basis of sex through its discriminatory, gender-biased Code and Title IX policies and procedures governing sexual misconduct proceedings, which intentionally subject male students like John to "less favorable" treatment than their female accusers.

364.    The attempt to punish John after graduation when no provision of the Code allows it reflects a bias in favor of prosecuting male students regardless of the University's published rules.  This constitutes gender discrimination as it is only designed to increase the statistics on male students punished.  It serves no educational purpose.

365.    UMass Amherst further violated Title IX by failing to conduct a "prompt" hearing by waiting more than 330 days to schedule one. The University also failed to abide by its own representation that it conducts hearings within 60 days unless good cause is shown, in which case, there should be notice to both parties regarding the delays. The University had every opportunity to convene a hearing while

John was still a student, but instead simply sat on its hands in callous disregard and with deliberate indifference for John's constitutional and statutory rights.  Here, the process has extended for an inexcusable period of time.

366.    Further, on September 22, 2017, the Department of Education issued significant interim guidance, with Questions and Answers to provide information about how OCR will assess a university's compliance with Title IX. The University's use of "gag orders" in John's case, during the investigation and most recently in advance of the purported hearing, run afoul of the 2017 guidance, which prohibits "gag orders" because they are "likely to deprive the parties of the ability to obtain and present evidence or otherwise defend their interests …."  (*September 2017 Q&A on Campus Sexual Misconduct,* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf, at 4).

367.    The University's imposition of harsh interim restrictions violated by Title IX because they were imposed for too long and to a far harsher degree than necessary without any hearing or notice and without regards for the limits on interim restrictions set forth in Title IX guidance.

368.    The University also violated Title IX by depriving John of his degree in contravention of its own regulations and without holding a hearing.

369.    The University engaged in gender discrimination by revealing John's confidential information while making every effort to safeguard Jane Roe's confidential information.

370.    The University engaged in gender discrimination by allowing female students to make false charges of sexual misconduct without any consequence or sanction, when the University's own policies impose sanctions, including potential termination, on an employee who makes a false accusation of sexual misconduct.

371.    As alleged previously, the University's investigation did not meet the requirements of Title IX that it be adequate, reliable, impartial and equitable.

372.    The University acted with callous and deliberate indifference to John's right by deliberately failing to provide him with updates on the status of the investigation despite OCR guidance that it do so.  This failure to adhere to follow OCR guidance resulted in additional compensable damages.

373.    In addition, the University's training materials for members of Hearing Boards are overtly biased.  They exhort members to believe the accuser and not question her account.

374.    And the UMass Men and Masculinities Center literature prominently displayed on the University's website demonstrates hostility to men.  The Center is related to the University's Title IX program because it was created in response to OCR identifying UMass as one of 55 schools under investigation.  The University's Code provisions have been deliberately designed by the University to favor the female accuser and disadvantage the accused male by, among other things, eliminating from the process fundamental procedural safeguards for the accused set forth in Title IX regulations, such as the right to an adequate, reliable, and impartial investigation, the right to present evidence and witnesses, and the right to fair notice of the school's procedures.  Coupling the University's Title IX program with the University's Center for Women and Community further violates Title IX.

375.    The University further demonstrated gender bias though its inconsistent application of the 2011 "Dear Colleague" Letter, applying it rigorously when a female student is the complainant, but denying its legal force when a male student seeks to invoke its protections in litigation, as discussed above.

376.    In furtherance of the University's discriminatory intent, in the event a hearing is held, the accused student has no right to cross-examine his accuser or witnesses, no right to present fact or expert witnesses on his behalf, and faces a Hearing Board whose members are required to "conduct a process that is sensitive to the needs of survivors" (as opposed to a process designed to arrive at a fair and just result).

377.    Given the complete lack of due process safeguards, it is effectively impossible for an accused student to meet the unfair and constitutionally impermissible burden of proving his innocence.

378.    In addition, the University's investigator on the case is required to provide "support" and "advocacy" to the accuser, and decides whether to conduct an investigation and whether a hearing will be held.  Here, Ward acted in John's case as the investigator with clear conflicts of interests and in violation of the Department of Education's warning that a person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school.

379.    OCR's 2011 Dear Colleague, investigations, and threats of financial retribution gave colleges and universities across the county, including UMass Amherst, a powerful legal and financial incentive to eliminate fairness and due process protections for accused male students.

380.    While the Dear Colleague Letter is merely a guidance document that does not have the force of law, OCR holds the specter of loss of Federal funds as a sword in the event it were to find that the University failed to comply with OCR's guidance.

381.    As previously alleged, although the Code is ostensibly gender-neutral, in practice and as implemented in John's case, it subjects John and male students to less favorable treatment than female students, because accused students in sexual assault cases are overwhelmingly, if not always, male, and the Code and the University's Title IX policies and procedures intentionally accord unequal treatment to them.

382.    Under pressure from OCR, the media, and student activists, the University deliberately set out to adopt sexual misconduct policies that would focus on the needs of female "victims" and "survivors" for validation, support, and protection from a fair and balanced process ahead of the needs of accused male students for due process protections and a fair and impartial investigation and adjudication process, and the University continues to adhere to those discredited policies.

383.    Title IX prohibits the imposition of University discipline where (as here) gender bias was a motivating factor behind the University's misconduct.

384.    The University's policies and procedures are based on unfair and archaic gender stereotypes and assumptions that female complainants are invariably fragile "victims" and "survivors" deserving of support regardless of their credibility or the veracity of their claims, and accused male students are "hegemonic male[s]" prone to violence who are not deserving of comparable support.

385.    The University treats female complainants differently than male respondents based on its outdated attitudes about females and overbroad generalizations and stereotypes about male and female sexual traits and behaviors – *i.e.*, male students are perceived as aggressors and perpetrators and female students are perceived as victims and survivors.

386.    The University is on notice of, and is deliberately indifferent to, the serious flaws in the investigation, the lack of equity and fairness, and the gender bias that infuses the process.

387.    The University selectively enforces the Code and Title IX policies by treating John as a male student accused of sexual misconduct less favorably than it would treat a similarly situated female student, who would not be subjected to the same disciplinary proceedings, which are premised on the gender-biased notion that males are invariably perpetrators and females are invariably victims of sexual assault.

388.    The University's conduct is so severe, pervasive, and objectively offensive that it is denying John equal access to education that Title IX is designed to protect.

389.    As a result of the foregoing, John is entitled to injunctive relief, compensatory damages, prejudgment interest and attorneys' fees and costs, and punitive damages on the basis that the University's conduct demonstrates reckless or callous indifference to the requirements of Title IX and its violations of Title IX are egregious and ongoing, with no sign of relenting.

**PRAYER FOR RELIEF**

WHEREFORE, John respectfully requests that this Court:

a.      Temporarily restrain, and preliminarily and permanently enjoin Defendants from continuing the disciplinary proceedings against John, including any form of disciplinary hearing;

b.      Immediately order Defendants to expunge any notation of any charges, interim restrictions, findings, and/or sanctions from John's transcript, education record, and disciplinary record to the extent that any such notation exists;

c.      Immediately restrain, and preliminarily and permanently enjoin Defendants from making any future notation of any charges, interim restrictions, findings and/or sanctions on John's transcript, education record, and disciplinary record;

d.      Order the University to confer the degree that John has earned and direct that the degree be awarded retroactively to when it should have been awarded had Defendants not withheld it;

e.      Issue a Declaration pursuant to 28 U.S.C. § 2201 that, by engaging in the actions and occurrences alleged in this Complaint, the University, as a public university, and Ward, Cardoso-Erase, and Ferreira in their official or individual capacities, or both, have willfully, recklessly or with callous indifference violated and continue to violate John's Fourteenth Amendment rights to due process and equal protection under the law and that the University engaged in gender discrimination in violation of Title IX;

f.      Award compensatory and punitive damages against UMass Amherst for reckless or intentional violations of Title IX, for conduct demonstrating a reckless or callous indifference to the requirements of Title IX, and for ongoing egregious violations with no sign of relenting;

g.      Award compensatory and punitive damages against each of Ward, Cardoso-Erase,  and Ferreira in their individual capacities pursuant to 42 U.S.C. § 1983 for violations of John's rights under the federal constitution and statute, acting intentionally and with callous indifference;

      h.      Award John his attorney's fees and costs and such other relief as the Court deems proper and just.

Respectfully submitted,

/s/ Michael R. Schneider
Michael R. Schneider, Esq.
(Mass. Bar No. 446475)
Good Schneider Cormier & Fried
83 Atlantic Avenue
Boston, MA 02110-3711
Tel:  (617) 523-5933
Email: ms@gscfboston.com

Patricia M. Hamill, Esq.
(Pa. I.D. No. 48416)
Lorie K. Dakessian
(Pa. I.D. No. 86102)
*Pro Hac Vice Motions Pending*
Conrad O'Brien PC
1500 Market Street
Centre Square – West Tower, Suite 3900
Philadelphia, PA 19102-1921
Tel: (215) 864-9600
Email: phamill@conradobrien.com
ldakessian@conradobrien.com
*Attorneys for Plaintiff John Doe*

Dated: October 11, 2017