# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| JOHN DOE, ) | |
| Plaintiff ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 3:17-cv-30145 |
| UNIVERSITY OF MASSACHUSETTS AMHERST, ) | |
| LOUIS B. WARD, Assistant Dean of Students, sued ) | |
| in his individual and official capacities, ) | |
| PATRICIA CARDOSO-ERASE, Associate Dean of ) | |
| Students, sued in her Individual and official capacities,) | |
| DEBORAH D. FERREIRA, Title IX Coordinator, sued ) | |
| in her  Individual and official capacities, ) | |
| Defendants ) | |

_____)

### REVISED OPPOSITION OF DEFENDANTS TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION PURSUANT TO FED. R. CIV. P. 65

This Revised Opposition is hereby filed to address concerns regarding identifying information contained in the Student Discipline file which was filed as Exhibit 1-A to the Defendants' original Opposition.[1]

This action was brought by Plaintiff John Doe, who has requested, *inter alia*, that the court enter an order halting the Hearing Board convened in his disciplinary proceedings at the University of Massachusetts; that his student record be expunged of any mention of the disciplinary proceedings; and that his degree from the university be immediately released.

---

[1] On November 21, 2017, Defendants' counsel was advised by Plaintiff's counsel that the court was in the process of impounding Exhibit 1-A; and that it would at the same time be lifting the order sealing Documents No. 18, 19, and 20.  It appears that the original Opposition (Document 19) contained redacted references to witnesses whose identities are now being kept confidential.  The purpose of this Revised Opposition is to remove any such confidential information.

Plaintiff's discipline arises out of allegations by a female student that Plaintiff and another male student forced her to perform oral sex on them at a late-night party and aggressively "fingered" her after unzipping and pulling down her pants.  (See Case File Re John Doe Discipline, attached as Exhibit 1-A to Louis Ward Affidavit (Exhibit 1)—page 1).

Plaintiff's Complaint is brought in two Counts: Count One for a violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983 (Against Defendants Ward, Cardoso-Erase, and Ferreira in Their Individual and Official Capacities); and Count Two for Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. (Against Defendant University of Massachusetts Amherst).

Now come the Defendants University of Massachusetts Amherst ("UMass"), Louis B. Ward, Individually and in his official capacity, Patricia Cardoso-Erase, Individually and in her official capacity, and Debora D. Ferreira, Individually, and in her official capacity ("Defendants") and hereby oppose Plaintiff's Motion for Temporary Restraining Order.

The Defendants submit that the handling of Plaintiff's discipline has been entirely lawful and proper, and in accordance with the provisions of the university Code of Student Conduct ("CSC").  The court should deny Plaintiff's motion because Plaintiff cannot show a likelihood of success on the merits, and because he will not suffer irreparable harm if the court does not grant his motion.  In addition, the public interest supports the University, a public institution of higher education, in maintaining good order and discipline on its campus through the student disciplinary procedures it has established.

The Defendants further submit that the discipline process should be permitted to run its course, including the submission to a Hearing Board convened pursuant to the CSC to make factual determinations in this matter.  The filing of this lawsuit and of this Motion are premature; and Plaintiff should not be permitted to block the normal and usual progression of the university

discipline process.  In support of this Opposition, UMass relies upon the Affidavit of Louis B.

Ward, Assistant Dean of Students.  (Ex. 1) and the Discipline Case File, Exhibit 1-A, filed under

seal and pursuant to the Confidentiality Order entered on November 3, 2017.

## FACTS

Jane Roe had filed charges with the university on November 2, 2016.  (1-A, 1).  During

the next several weeks, she was interviewed by university Assistant Dean Louis Ward (1-A, 2-4);

and he collected documents from her, including screen shots from her phone.  (1-A, 5-10).

Plaintiff was notified of the charges against him by a formal Notice of Charge dated January 4,

2017.  (1-A, 11).  He was advised that the university had received information that:

> On or about September 2, 2016, it is alleged [John Doe] engaged in non-
> consensual sexual acts, including vaginal penetration and oral sex, with [Jane
> Roe]. (Id.)

Plaintiff was advised to contact the Dean of Students Office to discuss the charges.  There were

then communications about setting up a meeting.  (1-A, 21,23).  On January 10, Assistant Dean

Ward was contacted by Plaintiff's attorney, at which time it was discussed that the attorney's

time was limited; and, accordingly, the meeting with John Doe was not scheduled to take place

until January 26.  (1-A, 28).  On January 19, 2017, Plaintiff's attorney sent a letter to the

university, requesting additional information about the charges, including the location and time

of the alleged assault.  (1-A, 31).  He then communicated with Associate Dean Cardoso on

January 23, advising her that he had advised John Doe not to speak with the Dean's Office due to

the "severity of the allegations."  (1-A, 36).  The attorney reiterated that he wished to receive

additional information.  In response Dean Cardoso informed him that he would be receiving

from the Dean's Office information regarding a follow-up interview with the complainant.  The

attorney also advised that he had a list of witnesses that he would be providing to Dean Ward.

(Id.).  Because the additional information would be forthcoming, at the behest of John Doe's

attorney, Dean Cardoso agreed that the January 26 meeting would be re-scheduled to permit

John Doe and his attorney time to review the additional information.  (1-A, 36, 37).

In the meantime, the Dean's Office continued its investigation.  Dean Ward had

previously interviewed Jane Roe on December 7, 2016.  (1-A, 2).  He had then obtained from her

screenshots from her phone on the night of the incident.  (1-A, 5-9).  During January Dean Ward

communicated with Jane Roe regarding the time and date stamps for her call history on the night

of the incident, as well as the persons to whom the calls were made.  (1-A, 38-39, 41).

On January 26, Dean Ward advised John Doe that the documents requested by his

attorney were ready for pick-up; and he asked that Doe call him by February 3 to re-schedule

their meeting.  (1-A, 44, 47).  John Doe's attorney followed up on January 27 with a letter

requesting that, "no action be taken at the Dean of Student's (sic) level until the completion of a

thorough Title IX investigation by the University."  (1-A, 51, 52-53).  In the letter Doe's attorney

also indicated that Doe would not be speaking at the Conduct Conference; and, presumably, he

wouldn't have to attend.  (1-A, 52).  The attorney also warned that if the matter were referred to

a Hearing Board "because [Doe] decides not to speak," this would amount to an improper

penalty.  (1-A, 53).  In a separate letter dated January 27, Doe's attorney listed 6 potential

witnesses, indicating that it was "imperative" that those persons be interviewed.  (1-A, 55).

On January 31 Dean Ward spoke with the second respondent against whom Jane Roe had

made a complaint.  That respondent appeared in person; but his attorney appeared by phone and

indicated that her client would not be sharing any information at that time.  (1-A, 58).

On February 10 Dean Ward met again with John Doe and his attorney to discuss the case.

(1-A, 59).  Per the advice of his attorney, Doe declined to provide his version of events;

however, he provided some information as to the list of witnesses and how they were involved.

(1-A, 59-60).  Dean Ward also received from Doe's attorney the statements of 3 of the witnesses,

which had been taken by the attorney.  (1-A,61-67).  On February 14 Dean Ward sent out letters to the 6 listed witnesses, as well as to another potential witness who had been on the phone with Jane Roe the night of the incident.  (1-A, 68-74, 72).  The letters requested that the witnesses contact him in order to meet to discuss the incident.

On February 21, John Doe's attorney sent another letter to Dean Ward, asking for all contents of his disciplinary file created or received after January 26 (he had already received the contents before that date).  (1-A, 77).

On February 27 Dean Ward interviewed the first of the proposed witnesses.  (1-A, 82). His office then followed up in re-contacting the other 6 witnesses.  (1-A, 86-91).  On March 7 Dean Ward interviewed the 2d proposed witness.  (1-A, 97).  His office then followed up in re-contacting the other 5 witnesses.  (1-A, 100-104).  On March 8 Dean Ward interviewed the 3d and 4th proposed witnesses.  (1-A, 107, 111).  During late March-early April, Dean Ward's office scheduled 2 meetings with Jane Roe, but she didn't appear.  She apologized and indicated that she had had to make up several tests and had been out of the country.  (1-A, 120).  They met on April 27 for a further interview.  (1-A, 121).

On May 24 Dean Ward had gathered the file contents of John Doe's discipline file, as he had been requested.  (1-A, 122).  The file was to be picked up by Doe, consistent with his selected method of delivery.  Dean Ward also requested that Doe contact him to further discuss his case.  (1-A, 125).  On May 26, Doe's attorney advised Dean Ward that his client had received the message; but that he was no longer in Massachusetts; and it would not be possible for him to pick up the file.  His client would also not be in a position to call Dean Ward during regular working hours, since he was starting a new job on June 1.  (1-A, 126).  On May 31 Doe advised Dean Ward that the file should be delivered to his attorney in Newton, MA.  (1-A, 128).

On May 31, in response to a request from Doe's attorney, Dean Ward indicated that he would be available to speak by phone any time before noon that day.  (1-A, 130).  Dean Ward and Doe's attorney spoke on May 31.  The attorney reiterated that his client could not come to Massachusetts for a meeting and could not speak during the work-day.  Dean Ward offered to stay late to accommodate Doe.  During this conversation Dean Ward advised Doe's attorney that because of factual disputes concerning the alleged incident, the matter would be referred to a Hearing Board.  (1-A, 132).  On June 2 John Doe contacted Dean Ward and requested a conference call for June 14 at 5:30 or 6:00 PM.  Dean Ward agreed that Doe or his attorney could call him at 5:30 on June 14.  (1-A, 133-134).

On June 14, before the scheduled call, Dean Ward emailed John Doe and indicated that it was his hope that after having received the case file, that Doe would provide a narrative addressing the charges that had been filed.  (1-A, 147).  At the time of the call, on the advice of his attorney, Doe declined to provide a narrative or to answer any questions about the incident.  (1-A, 149-150).  On June 15 Dean Ward spoke with the 2d respondent and with his attorney.  The 2d respondent likewise declined to provide a narrative or to answer any questions about the incident.  (1-A, 151-152).

On June 16, 2017, Dean Ward advised Doe that the investigation was concluded; and the matter had been referred to a Student Conduct Hearing Board.  Dean Jonathan Connary would be in touch to discuss scheduling.  (1-A, 153).  On October 6, 2017, after consultation, Doe was advised that a Hearing Board had been scheduled to take place on October 18, 2017.

## ARGUMENT

## THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

In evaluating a motion for a temporary restraining order, the Court considers the same four factors that apply to a motion for preliminary injunction.  Commerce Bank & Tr. Co. v.

Prop. Administrators, Inc., 252 F.Supp. 3d 14 (D.Mass. 2017).  In order to prevail on a motion for preliminary injunction, Plaintiffs must show (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury to Plaintiffs if the injunction is not granted; and (3) that the threatened injury to Plaintiffs in the absence of an injunction outweighs the risk of harm to the Defendant if the injunction is entered.  Packaging Industries Group, Inc. v. Cheney, ("Cheney") 380 Mass. 609, 616, 621-22 (1980).  On all of these issues, the burden of proof rests upon the moving party.  Id.  See also Doe v. Devonshire, ("Devonshire") 181 F.Supp. 3d 146, 151 (D.Mass. 2016); Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir.2004); Largess v. Supreme Judicial Ct., 317 F.Supp.2d 77, 81 (D. Mass. 2004); Quincy Cablesvs. Inc. v. Sully's Bar, Inc., 640 F.Supp. 1159, 1160 (D.Mass. 1986).  "If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.... Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue." GTE Products Corp. v. Stewart, 414 Mass. 721, 722-3 (1993), citing Cheney at 617.  Ultimately, a preliminary injunction is an "extraordinary and drastic remedy that is never awarded as of right." Devonshire, at 151, citing Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011).  Here, Plaintiff cannot show a reasonable likelihood of success on the merits; he cannot show irreparable harm by a blocking of the discipline process; and the balance of hardships tips decisively in favor of the Defendants.  Further, both the university and the public have a substantial interest in maintaining a safe campus, and the university must therefore be able to conduct thorough investigations and hold disciplinary hearings when confronted with allegations of misconduct that threaten the safety of its students.

7

I. **PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.**

    A. **All Claims For Injunctive Relief Against the Individual Defendants Acting In Their Personal Capacities Should Be Dismissed Because They Are Not Proper Parties Against Whom Such Relief May Be Sought.**

To the extent that Plaintiff seeks injunctive relief against the individual Defendants acting in their personal capacities, it is clear that those Defendants are not the proper parties to grant such relief.  Plaintiff seeks in his Prayer for Relief that the court enter an injunction enjoining the Defendants from "continuing the disciplinary proceedings against [Plaintiff], including any form of a disciplinary hearing."  These are clearly not within the purview of the individual Defendants acting in their personal capacities.  Defendants submit that the individual Defendants are not proper parties to provide the injunctive relief sought by Plaintiff.  See Dirrane V. Brookline Police Dept., 315 F.3d 65, 72 (2002).

    B. **Plaintiff Has Not Submitted Affidavits Or other Evidence In Support Of His Allegations.**

It does not appear that there has been any verification of the allegations contained in Plaintiff's Complaint, such that those allegations could support a claim for injunctive relief.  Defendants submit that on this basis alone, the motion should be denied.

    C. **Plaintiff Cannot Show A likelihood of Success With Regard To Count I Because The Process Afforded Was Reasonable And Provided Plaintiff With An Opportunity To Respond, Explain, And Defend.**

Plaintiff asserts a claim in Count One for a violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983.  To bring a claim pursuant to § 1983, a plaintiff must allege that some "person" acting under color of law deprived him of any rights, privileges or immunities secured by the constitution. 42 U.S.C. § 1983.  However, here, the process afforded Plaintiff as part of the UMass discipline process was entirely in accord with the requirements of the 14th Amendment.

Courts are reluctant to intervene in academic and disciplinary decisions made by colleges and universities.  Schaer v. Brandeis University, 432 Mass. 474, 482, 735 N.E.2d 373, 147 Ed. Law Rep. 247 (2000); See also Russell v. Salve Regina College, 890 F.2d 484, 489 (1st Cir.1989), rev'd on other grounds, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), reinstated 938 F.2d 315 (1st Cir.1991); Clayton v. Trustees of Princeton Univ., 608 F.Supp. at 437-438; Curators of the Univ. of Missouri v. Horowitz, 435 U.S. 78, 87, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); Coveney v. President & Trustees of the College of the Holy Cross, 388 Mass. 16, 19, 445 N.E.2d 136 (1983); Cloud v. Trustees of Boston Univ., 720 F.2d 721, 724 (1st Cir.1983).  In particular, courts generally will not become involved in disciplinary decisions where the misconduct alleged is of a type tending to arise in the specific context of the university setting.  Courts have recognized that educational institutions are especially knowledgeable about matters involving students and academic life and are, therefore, inclined to grant them broad deference in such matters.  (see Schaer, supra, at 27, holding that in matters of special concern to educational institutions, "the degree of deference will still be very considerable."). [2]

A public university student has certain due process rights and, accordingly, student disciplinary procedures must comport with general notions of fundamental fairness.  Gorman v. Univ. R.I., 837 F.2d 7, 12 (1st Cir. 1988), citing Goss v. Lopez, 419 U.S. 565, 574 (1975). However, the University's disciplinary procedures which have been offered to Plaintiff are in accord with the due process protections required to be afforded to public university students. Procedural due process and fundamental fairness require "*some* kind of notice and *some* kind of hearing," Goss, 419 U.S. at 579 (emphasis in original)[3], but "[d]ue process which may be said to

---

[2] Although Schaer was taken up on appeal to the Supreme Judicial Court, see supra, this holding was undisturbed.

[3] Goss involved high school students who had been suspended without prior notice or a hearing. The court found that because a 10–day suspension was not a "de minimus" deprivation of the

mean fair procedure, is not a fixed or rigid concept, but, rather, is a flexible standard which varies depending on the nature of the interest affected, and the circumstances of deprivation." Gorman, 837 F.2d at 12 (citing Mathews v. Eldridge, 424 U.S. 318, 334 (1976)).  "The hearing, to be fair in the due process sense, implies that the person adversely affected was afforded the opportunity to respond, explain and defend."  Gorman, 837 F.2d at 13.

Put simply, there is no law to support Plaintiff's claim that the University's disciplinary process violated his due process rights.  When a school disciplines a student for nonacademic reasons, the student "must be given some kind of notice and afforded some kind of hearing." Goss, 419 U.S. at 579 ("requiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action.")  The notice and hearing attendant to expulsion of a college student are not required to resemble a "full-dress" civil or criminal trial.  Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 159 (5th Cir.1961) ("we are confident that precedent as well as a most fundamental constitutional principle support our holding that due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct.")  To determine the sort of notice and hearing to which a student is entitled, a court should balance the "student's interest in avoiding unfair or mistaken exclusion from the educational process against the school's interest in maintaining discipline." Jaksa v. Regents of Univ. of Mich., 597 F.Supp. 1245, 1248 (E.D.Mich.1984), aff'd 787 F.2d 590 (6th Cir.1986) (citing Goss, 419 U.S. at 579–80).  Since Dixon, the federal courts:

---

students' property or liberty interests in an education, it could not be imposed in "complete disregard of the Due Process Clause."  419 U.S. at 576.  Accordingly, students must be given "*some* kind of notice and afforded *some* kind of hearing."  Id. at 579.  Under the circumstances, it found that due process required that, "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  Id. at 581.

> have uniformly held that fair process requires notice and an opportunity to be heard before the expulsion or significant suspension of a student from a public school . . . on review, the courts ought not to extol form over substance, and impose on educational institutions all the procedural requirements of a common law criminal trial.  The question presented is not whether the hearing was ideal, or whether its procedure could have been better.  In all cases the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual the essential elements of due process.

> Gorman, 837 F.2d at 13 (citations omitted).

In fact, the Supreme Court has cautioned that care must be taken in the educational discipline process to avoid procedures that would result in undue expense and adverseness:

> [F]urther formalizing the suspension process and escalating its formality and adversary  nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.  Goss, 419 U.S. at 583.

"Generally, in examining administrative proceedings, the presumption [of fairness in conducting the disciplinary proceeding] favors administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut the presumption."  Gorman, 837 F.2d at 15.  "[T]he concept of due process is equivalent to `fundamental fairness,' and that '[n]otice and an opportunity to be heard have traditionally and consistently been held to be the essential requisites of procedural due process.'"  Newman v. Commonwealth, 884 F.2d 19, 23 (1st Cir. 1989) (citations omitted).

The investigation process in this case has been fair and appropriate and has always afforded the Plaintiff the opportunity to comprehend the charges against him and to respond to those charges.  As set out in the documents comprising Plaintiff Doe's Case File, the Dean investigating the claim against Doe communicated with Doe and his attorney on numerous occasions.  He advised them of the charges against Doe and continued to advise them of developments during the investigation.  He provided them with all notes regarding interviews with the complainant and with several witnesses.  He sought out (several times) the witnesses who had been proposed by Doe's attorney, and whose participation Doe's attorney described as

"imperative."  Ultimately, Dean Ward was able to interview 4 of those witnesses.  When the Student Conduct Hearing Board was scheduled, this provided the Plaintiff with a full opportunity to explain to the Hearing Board his "side of the story."  This is exactly the type of process envisioned by the courts in Goss, Gorman, and Dixon: "the opportunity to respond, explain and defend."  In fact, in attempting to thwart the Hearing Board process, it is Plaintiff himself who is limiting his own ability to present his version of the facts.

Plaintiff argues that he has been unfairly prejudiced by delays in the process.  A review of the Discipline File reflects that throughout the process, many of the delays were occasioned by John Doe and his attorney; and in some instances were occasioned by the complainant or by witnesses' failure to respond to requests.  After the Charge of January 4, the first time that Doe's attorney proposed a meeting was for January 26.  (1-A, 28).  He then requested additional information; and the meeting had to be postponed.  (1-A, 36, 37).  On January 27 Doe's attorney warned that, "no action be taken at the Dean of Student's (sic) level until  the completion of a thorough Title IX investigation by the University."  (1-A, 51, 52-53).  On that same date he insisted that Dean Ward interview 6 witnesses.  (1-A, 55).  After speaking with Doe and the attorney about the information held by the proposed witnesses, Dean Ward contacted all of them, as well as an additional potential witness who had been on the phone with Jane Doe the night of the incident.  (1-A, 68-74, 72).  From February 14 through early March, Dean Ward interviewed those witnesses who responded to his communications.  (1-A, 82-111).  After 2 re-schedulings, Dean Ward was able to meet again with the complainant on April 27 for a further interview.  (1-A, 121).  As of May 24, Dean Ward had gathered the file contents of John Doe's discipline file, as he had been requested to do; and the file was ready for pick-up.  (1-A, 122, 125).  However, on May 26, Dean Ward learned from Doe's attorney that without advising the Dean's Office, Doe had apparently already left Massachusetts; and it would not be possible for him to pick up

the file.  Doe would also not be in a position to call Dean Ward during regular working hours, since he was starting a new job on June 1.  (1-A, 126).  Even at that point, and despite Dean Ward's willingness to accommodate Doe's schedule, Doe requested that a further communication take place only on June 14, as long as the dean could speak with him after regular work hours.  (1-A, 133-134).  It was after the June 14 call that Dean Ward provided formal notice on June 16 that the investigation was concluded; and the matter had been referred to a Student Conduct Hearing Board.  (1-A, 153).  Throughout this process John Doe and his attorney have not shown any desire to move the case along more quickly; and in several instances, have delayed the process for weeks at a time.  It is disingenuous at best to now argue that John Doe has been so prejudiced by delay that it is impossible to conduct a Hearing Board.  To the extent that it took additional time for the Hearing to be scheduled, it does not appear from Plaintiff's Motion that this would have occasioned additional "prejudice."[4]

Plaintiff next argues that he has been prejudiced by the dean's failure to gather all relevant evidence and that he "failed to critique discrepancies in Jane Roe's version of events." (Pl. Brief at 12).  Defendants submit that there are differences in the versions of events as set out by the parties.  The best way to address this is through the Hearing Board process, which Plaintiff is attempting to avoid.  Plaintiff suggests that due process would require representation by an attorney or the ability to cross-examine witnesses.  However, in its rejection of the

---

[4] To the extent that Plaintiff argues that witnesses have left school and are not now available, he provides no support for that statement; nor can he support an argument that those witnesses would have appeared at an earlier point in time.  Several of them never responded to 3 separate communications from Dean Ward.  In addition, the case for prejudice is very problematic.  The statements of those witnesses could have been utilized in the less formal Hearing Board process. Further, the helpfulness of the proposed witnesses to Plaintiff's case is highly questionable. Defendants refer the court to the interviews of Witnesses found at Exhibit 1-A, pp. 82, 97, and 107; and the statements provided by Doe's attorney (1-A, 61-67).  The large number of inconsistencies in the version of events as described by those witnesses would indicate that they would have very limited value as witnesses on behalf of Doe.

"criminal trial" level of procedure, the <u>Gorman</u> court specifically refused to require either of

these in the context of university discipline:

> As indicated in the district court's opinion, the weight of authority is against
> representation by counsel at disciplinary hearings, unless the student is also facing
> criminal charges stemming from the incident in question. <u>Gorman, 646 F.Supp. at 806;</u>
> <u>see</u> <u>Wasson v. Trowbridge</u>, 382 F.2d 807, 812 (2d Cir.1967);
>                                          . . .
> As for the right to cross-examination, suffice it to state that the right to unlimited cross-
> examination has not been deemed an essential requirement of due process in school
> disciplinary cases. (cites omitted).  <u>Id.</u> at 16.

Plaintiff further argues that it is a violation of due process for the university to discipline

him under the CSC when he is no longer enrolled as a student.  This is clearly incorrect as a

matter of law.  State universities have the authority to investigate former students based on

allegations that they have committed violations of the student conduct code while enrolled at the

university. <u>Doe v. Salisbury Univ.</u>, 107 F.Supp. 3d 481 (D. MD, 2015); see also <u>Dinu v.</u>

<u>President & Fellows of Harvard Coll.</u>, 56 F.Supp. 2d 129 (D.Mass 1999) (student who completes

his or her course work remains "student" subject to college's disciplinary code while awaiting

award of degree).  Plaintiff also suggests that the withholding of his degree has violated his due

process rights.  However, schools hold an implied power to control school records and to revoke

credentials conferred upon students (e.g., degrees, credits, etc.), where such actions are in

response to a former student's conduct that occurred during the student's enrollment, and as long

as the school acts with good cause and after due process.  <u>Salisbury Univ.</u>, 107 F. Supp. 3d at

492. See also <u>Goodreau v. Rector and Visitors of Univ. of Va.</u>, 116 F.Supp.2d 694, 702–03 (W.

D. Va. 2000).  (finding that the University of Virginia held an implied power to revoke a

graduate's degree where the graduate had stolen money during the time he was enrolled at the

school).  In the present case, Plaintiff's degree is being *withheld*, not revoked.  It is unreasonable

to say that the university's implied power to revoke a degree does not encompass a power to

withhold such degree while awaiting the outcome of a disciplinary process.  "A student faced

with expulsion or other discipline for violating school rules is entitled to due process before he can be deprived of his interest in *continuing his education*. There are, however, no precise parameters for the amount of process the student is due before the discipline can be imposed." Doe v. Univ. of Cincinnati, 173 F.Supp.3d 586, 600 (S.D. Ohio 2016) (emphasis added). Plaintiff was permitted to continue and complete his education, which is the primary concern in cases such as this. See Gorman, 837 F.2d at 14 ("The interests of students in completing their education, as well as avoiding unfair or mistaken exclusion from the educational environment, and the accompanying stigma are, of course, paramount"). Plaintiff's due process rights have not been violated by the university's decision to withhold his degree during the disciplinary process.

The remaining due process allegations are without support of any kind and should be dismissed. Plaintiff suggests that the investigator and Hearing Board members "may have" irreconcilable conflicts of interest, because they are also trained as "advocates for 'victims' and 'survivors' of sexual assault." By this reasoning, anyone trained in dealing with sexual assaults would be forever banned from investigating such assaults or sitting on a panel to make factual determinations.[5] There is no apparent basis for Plaintiff's bare statement that training materials at the university are "overtly biased;" but it appears that this may be a similar attempt to disqualify persons with actual training in sexual assaults. Defendants submit that it is absurd to make the allegation that Dean Ward "intimidated witnesses by warning them against discussing the allegations with others;" or that the Notice of his Hearing Board sent to Plaintiff "also issued

---

[5] This argument has also been rejected by the courts on a number of occasions. In Gomes v. Univ. of Maine Sys., 365 F.Supp.2d 6, 31-32 (D.Me 2005), the fact that the hearing board chair participated in sexual assault victim advocacy programs did not demonstrate that she was biased against the plaintiff in his sexual assault misconduct disciplinary hearing. In addition, school disciplinary boards are entitled to a presumption of honesty and impartiality absent a showing of actual bias. Doe v. Univ. of Cincinnati, 173 F.Supp.3d 586, 601-602 (S.D. Ohio 2016), citing Atria v. Vanderbuilt Univ., 142 Fed. Appx. 246, 256 (6th Cir. 2005). A plaintiff must allege facts sufficient to overcome this presumption, such as statements by board members or university officials indicating bias or a pattern of decision-making suggesting that gender was an influence. Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 251 (2nd Cir. 1995).

what is in effect a gag order on John . . . by cautioning him . . . that he should avoid any actions that could be interpreted [by the University] as an attempt to intimidate or otherwise intimidate a witness connected with the incident…"

### D. <u>Plaintiff Cannot Show A Likelihood of Success With Regard To The Title IX Claims Set Out In Count II.</u>

Plaintiff's motion touches on three theories of liability under Title IX: (1) "deliberate indifference" (2) "archaic assumptions" and (3) selective enforcement." Plaintiff has provided no support at all for these theories.

It is clear that Plaintiff's Title IX claim based on a "deliberate indifference" theory must fail as a matter of law. The standard for the circumstances under which a recipient of funding from the United States Department of Education may be liable for damages on account of "deliberate indifference" is set out in <u>Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ:</u>

> If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment. *645 That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it. . . . Moreover, because the harassment must occur "under" "the operations of" a funding recipient, see 20 U.S.C. § 1681(a); § 1687 (defining "program or activity"), the harassment must take place in a context subject to the school district's control . . .
>
> These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs.
>
> <u>Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.</u>, 526 U.S. 629, 644–45, 119 S. Ct. 1661, 1672, 143 L. Ed. 2d 839 (1999)

The current case contains none of the factors enumerated in <u>Davis</u>. There does not appear to be any evidence that Plaintiff was harassed (as opposed to Jane Roe); and Plaintiff nowhere alleges that the university's "indifference" subjected him to further harassment. Indeed, there is no evidence that any such harassment occurred. In addition, <u>Davis</u> limits a recipient's damages

liability to "circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." Unlike the circumstances where a young child at school may be monitored by teachers and aides, a college student living off-campus is not generally subject to a great deal of control by a university. See also <u>Mallory v. Ohio U.</u>, 76 Fed. App'x 634, 638 (6th Cir. 2003).

"Deliberate indifference claims are typically brought in cases where a school has ignored a victim's complaint of sexual harassment or assault." <u>Boston College</u>, 2016 WL 5799297, at *26 (D.Mass. Oct. 4, 2016), citing <u>Doe v. Brown Univ.</u>, ("<u>Brown</u>") 166 F.Supp. 3d 177, 190-91 (D.R.I. 2016). Moreover, "courts have questioned its application to a case of a disciplined student." <u>Brown</u>, at *191, citing <u>Marshall v. Ohio Univ.</u>, 2015 WL 1179955, at *8 (S.D. Ohio Mar. 13, 2015) ("It is unclear as to how exactly this [deliberate indifference] claim applies to the facts of this case, as usually, this claim is asserted by a victim against a university official who failed to protect him or her from harassment or otherwise address the alleged misconduct"). Again, the instant case presents no allegation that Plaintiff has been the victim of harassment by another student.

Plaintiff's Title IX claim based on an "archaic assumptions" theory is similarly unlikely to succeed because it is inapplicable to the circumstances of this case. "The archaic assumptions standard applies when a plaintiff seeking equal athletic opportunities demonstrates discriminatory intent in actions taken because of classifications based upon archaic beliefs and stereotypes about gender." <u>Mallory</u>, 76 F.App'x at 638, citing <u>Pederson v. La State Univ.</u>, 213 F.3d 858, 880-82 (5th Cir. 2000); <u>Marshall v. Ohio Univ.</u>, 2015 WL 7254213, at *8 (S.D. Ohio Nov. 17, 2015). "The 'archaic assumptions' standard appears [to be] limited [in application] to unequal athletic opportunities." <u>Doe v. Baum</u>, 227 F.Supp. 3d 784, 821 (E.D.Mich. 2017) (alteration in original); <u>Doe v. Cummins</u>, 662 Fed.Appx. at 451 n.9, 2016 WL 7093996, at *12

n.9.  Plaintiff has not cited any case applying the "archaic assumptions" theory to a case such as

this, where the complaint concerns an allegedly discriminatory policy that has nothing to do with

any athletic program.

Finally, Plaintiff's argument that his Title IX rights were violated based on a "selective

enforcement" theory must also fail. In order to prevail on a Title IX "selective enforcement"

claim, a "plaintiff must establish that his gender was a motivating factor behind either the

College's decision to pursue disciplinary action against him or its decision as to the severity of

punishment to impose upon him."  Doe v. Amherst Coll., 238 F.Supp.3d 195, 223 (D.Mass.

2017).  Thus, to support a claim of "selective enforcement," the plaintiff must demonstrate that a

female was in circumstances sufficiently similar to his own and was treated more favorably by

the University.  Mallory 76 F.App'x at 641. Courts will look for "both factual allegations

demonstrating an inconsistency in enforcement and a causal connection to gender bias."  Doe v.

Univ. of Mass.- Amherst, ("UMass-Amherst") 2015 WL 4306521 at *8. Here, as in UMass-

Amherst, Plaintiff has not alleged any facts to support an argument that male and female students

accused of sexual harassment are treated differently by the university in terms of the way

complaints are pursued or discipline is imposed.[6]

## II.     PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IF THE RESTRAINING ORDER IS DENIED.

---

[6] This court has characterized these types of Title IX claims under  the framework developed by the Second Circuit in *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994).  "In one category are claims alleging bias in the disciplinary process led to an erroneous outcome. *Yusuf*, 35 F.3d at 715.  The other category includes claims asserting selective enforcement.  *Id.*  To succeed on an erroneous outcome claim, a plaintiff must demonstrate there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff and (3) specific circumstances causally connecting gender bias to the erroneous outcome. *Id.* A selective enforcement claim requires a plaintiff to establish "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id."* Doe v. Amherst Coll., 238 F. Supp. 3d 195, 222 (D. Mass. 2017).  Clearly, this claim would fail under either of these theories.

Irreparable harm is a "substantial injury that is not accurately measurable or adequately

compensable by money damages. <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc</u>., 103 F.3d 12,

19 (1st Cir. 1996).  It is a "necessary threshold showing for awarding preliminary injunctive

relief." <u>Matos ex rel. Matos v. Clinton Sch. Dist</u>., 367 F.3d 68, 73 (1st Cir. 2004).  Plaintiff

argues that he will suffer irreparable harm because of the "stain of sexual misconduct" on his

education record, denied or impaired career and graduate opportunities, and a wrongful stigma.

(Plaintiff's Brief, at 18).  However, without a hearing, it is impossible to say whether Plaintiff's

education record will ultimately include "the stain of a notation of sexual misconduct."

Plaintiff's next argument, that he will suffer irreparable harm by being denied career or graduate

school opportunities, is similarly without merit. Plaintiff has already obtained post-graduate

employment, and any suggestion that future opportunities will be denied or impaired hinges on

the prospect of future harm.  "To demonstrate the prospect of future harm, …a plaintiff must

show more than that she has been injured." <u>Gonzalez-Droz v. Gonzalez-Colon</u>, 573 F.3d 75, 79

(1st Cir. 2009) (quoting <u>Steir v. Girl Scouts of the USA</u>, 383 F.3d 7, 16 (1st Cir. 2004)).

Finally, and most importantly, there is nothing exigent about Plaintiff's circumstances.

He is employed and moving forward with his life.  The discipline process should be permitted to

proceed.

## III.    THE BALANCE OF HARDSHIP AND PUBLIC INTEREST MANDATES IN FAVOR OF THE DEFENDANTS.

The instant case is one where the balance of hardships and the public interest tip squarely in

favor of the University Defendants.  The university has a strong interest in the "educational

process," including maintaining a safe learning environment for all its students, while preserving

its limited administrative resources.  See <u>Goss</u>, 419 U.S. at 580, 583, 95 S.Ct. 729; see also

<u>Gorman</u>, 837 F.2d at 14–15 ("Although the protection of [a student's private interest] would

require all possible safeguards, it must be balanced against the need to promote and protect the

primary function of institutions that exist to provide education."). Citizens of the Commonwealth who send their children to the university have the right to expect that the university will take reasonable steps to maintain order and to provide a safe and secure environment for their children to study and live in.

Where the Plaintiff is essentially seeking to end the discipline that has been brought against him, this would send a message to students that the university is powerless to enforce its disciplinary code and to rein in undisciplined or even violent students. Even more importantly, if the discipline does not go forward, it would act to further harm Jane Roe, who is currently studying at the university. She would be told that her attempts to avail herself of the disciplinary process were totally fruitless. Plaintiff should be required to submit to the discipline process so that a proper determination may be made.

## CONCLUSION

For all of the foregoing reasons, the Defendants respectfully request that this court deny Plaintiff's Motion for Temporary Restraining Order.

Dated:  November 21, 2017          UNIVERSITY DEFENDANTS
                                   By their attorney,


                                   /s/ Jean M. Kelley
                                   Jean Marie Kelley, Esquire, B.B.O. #265540
                                   Senior Litigation Counsel
                                   University of Massachusetts
                                   Office of the General Counsel
                                   333 South Street – 4th Floor
                                   Shrewsbury, MA  01545
                                   Telephone:  (774) 455-7303  Fax:  (774) 455-7310
                                   jkelley@umassp.edu

**CERTIFICATE OF SERVICE**

I, Jean Marie Kelley, counsel for the Defendants , hereby certify that this Opposition and Certificate of Service filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

_/s/  *Jean Marie Kelley*_____

Jean Marie Kelley