IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br>    Plaintiff,<br><br>v.<br><br>UNIVERSITY OF MASSACHUSETTS AMHERST,<br>LOUIS B. WARD, Assistant Dean of Students,<br>sued in his individual and official capacities, PATRICIA<br>CARDOSO-ERASE, Associate Dean of Students,<br>sued in her individual and official capacities,<br>DEBORA D. FERREIRA, Title IX Coordinator,<br>sued in her individual and official capacities,<br>    Defendants. | No. 3:17-cv-30145-MGM |

**PLAINTIFF'S MEMORANDUM REGARDING SUPPLEMENTAL AUTHORITY**

Pursuant to the Court Order of June 19, 2018, Plaintiff submits this Supplemental Authority Memorandum. In *John Doe. v. Trustees of Boston College,* No. 16-2290, 2018 WL 2752608 (1st Cir. June 8, 2018), a graduate of Boston College and his parents sued the University for breach of contract, violation of Title IX, and tort claims. The First Circuit affirmed in part and reversed in part the district court's grant of summary judgment for the defendants and remanded for further proceedings. In so doing, the First Circuit provided guidance on two issues in this case.[1]

First, with respect to the Title IX "deliberate indifference" claim, the First Circuit referred to decisions by the Sixth and Second Circuits, which, while applying slightly different pleading standards, recognized that a pleading alleging that a university has bowed to campus-wide criticism or outside pressure in implementing a gender-biased student conduct system survives a motion to dismiss. Slip Op. at 42-43 n.12 & 13 (attached to Doc. 65), citing *Doe v. Miami Univ.,*

---

[1] The Defendants here referred to the district court's *Boston College* decision in their Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. 19 at 17). In his Amended Reply Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiff pointed out that "[a] decision from the First Circuit is pending" on the appeal of the district court's decision. (Doc. 29 at 17 n.10).

882 F.3d 579, 588, 592-94 (6th Cir. 2018) (holding complaint alleging university "faced external pressure" from DOE to be more vigorous in combating sexual assaults against women, as well as lawsuits and statistical evidence suggesting a pattern of gender-biased decision making, contained "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'"); *Doe v. Columbia Univ.,* 831 F.3d 46, 56 (2d Cir. 2016) (holding complaint alleging university was motivated to favor female accuser over accused male student due to media and campus criticism that the university did not take complaints of sexual assaults of women seriously was adequate to "support a minimal plausible inference" of gender bias). The Court found that the *Boston College* plaintiffs did not present sufficient evidence that University administrators were "motivated by gender bias" to survive the defendants' summary judgment motion. Slip. Op. at 50.[2] Instead, the plaintiffs presented only "conclusory allegations" of gender bias based on the "tone" of University administrators, generic concerns about OCR's 2011 Dear Colleague Letter, and a perception the University presumed Doe's guilt. *Id.* at 26-27, 44-47. The Court concluded that, even after "substantial discovery," there was a "complete lack of evidence" showing the college's actions were motivated by gender bias. *Id.* at 47.

Unlike the "conclusory allegations" in *Boston College*, John's complaint presents factual assertions that the University's "comprehensive revision" to its Title IX procedures in response to the 2011 Dear Colleague Letter (Compl. ¶¶ 189-198), and its subsequent reactions to outside pressures, were motivated by gender bias:

---

[2]Here, John has presented two Title IX theories: (1) "[t]he University selectively enforces the Code and Title IX policies by treating John as a male student accused of sexual misconduct less favorably than it would treat a similarly situated female student, who would not be subjected to the same disciplinary proceedings, which are premised on the gender-biased notion that males are invariably perpetrators and females are invariably victims of sexual assault," Compl. ¶ 387, and (2) "[t]he University's policies and procedures are based on archaic gender stereotypes and assumptions that female complainants are invariably fragile 'victims' and 'survivors' deserving of support regardless of their credibility or the veracity of their claims, and accused male students are 'hegemonic male[s]' prone to violence who are not deserving of comparable support." *Id.* ¶ 384.

- On May 1, 2014, the day OCR included UMass Amherst on a list of 55 schools under investigation, the University announced its "partnership with the Center for Women and Community," whose goal was "to provide support to survivors of sexual assault ... and "advocacy and support services that address ... multiple oppressions experienced by women," as well as to develop a training program for investigators and hearing boards that would adopt "trauma-informed practices." Compl. ¶¶ 199-200, 205-206, 213-216.

- That same day, the University's Title IX Office announced it had adopted a "survivor-centered" approach to sexual misconduct investigations and hearings, under which all members of the University community are exhorted to "BELIEVE" and are instructed, "Don't question. Don't judge. Just believe and support." *Id.* ¶¶ 198, 220, 223, 373.

- Shortly thereafter, the University created and funded The Men and Masculinities Center, which claims that men who adhere to "more traditional constructions of masculinity" are "more likely to engage in a range of unhealthy and risky behaviors including ... [s]exual and relationship violence." *Id.* ¶¶ 82-84, 226-230.

- Leaving no doubt it was bowing to outside pressure, the University issued a public statement explaining that its "student conduct code has been revised.... We've been very concerned with this; it's an issue here and across the country." *Id.* ¶ 202. In short, the University responded to pressure from the government, press, and students by changing its policies to make it much more likely that an accused student (almost always male) would be found responsible for the alleged misconduct. *Id.* ¶¶ 374-379.

With these concerns at the forefront, Defendants acted with deliberate indifference toward John by imposing overly broad interim restrictions and barring him from attending graduation as a penalty, without any finding of wrongdoing, depriving him of access to educational benefits and causing him severe mental distress even though OCR's guidance provides that interim restrictions must ensure that neither the accused nor the accuser is deprived of educational opportunities. *Id.* ¶¶ 45-57. University officials wrote to John, "you may experience feelings of anxiety and uncertainty during this process" (*id.* ¶ 53), yet made no effort to promptly conclude the process. Defendants also engaged in selective enforcement in the discriminatory imposition of interim restrictions, in excusing Jane Roe's delays while attacking John for even asking for an investigation, and by informing Jane Roe of the status of proceedings while keeping John in the dark. Defendants failed to preserve Jane's contemporaneous text, email, and phone records, obtain other known exculpatory evidence, or interview percipient witnesses, and issued a "gag order" preventing John

3

from interviewing witnesses and collecting evidence to prepare his defense. *Id*. ¶¶ 35-44. In light of these allegations, John has pleaded facts sufficient to support a reasonable inference of gender bias. This is so even if "alternative non-discriminatory explanations for the defendants' behavior may exist" at this stage of the litigation. *Miami Univ.,* 882 F.3d at 594. Here, there are no alternative non-discriminatory explanations for the University's incorporation of the Center for Women and Community and The Men and Masculinities Center into the disciplinary process other than to demonstrate it would allow its process to be driven in part by two organizations whose agendas favored women over men.

Defendants may argue *Miami* and *Columbia* should be disregarded because the pending motions were purportedly briefed and argued based on *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 2004), a Second Circuit case that pre-dated *Columbia* by a dozen years. Any such assertion would be inaccurate. The Second Circuit explicitly stated its *Columbia* decision was consistent with *Yusuf* and established no new pleading standard. 831 F.3d at 55-56. *Yusuf* established a minimal pleading burden to adequately allege a Title IX claim, *i.e.*, "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." 35 F.3d at 715. The complaint sustained in *Yusuf* alleged that the complainant brought a false accusation because Yusef had brought a criminal complaint against her boyfriend and that male students were invariably found guilty in the disciplinary process, *id*. at 716, but asserted none of the campus-wide pressures alleged in *Miami*, *Columbia*, and here, and nothing like the University's gender-biased reaction to OCR's "naming and shaming," or the one-sided investigation and interim restrictions that favored the female student at the expense of the male student.

Second, while *Boston College* involved a breach of contract claim against a private university where constitutional due process and 42 U.S.C. § 1983 are not implicated, the ruling

provides guidance on "fundamental fairness" and due process in campus disciplinary proceedings.[3] The First Circuit found that where, as here, a university promises to complete its investigation within sixty days, due process and fundamental fairness, as well as it contractual obligations, require the university to complete the process within that time period, even if delay would afford the respondent time to obtain exculpatory forensic evidence. Slip. Op. at 24. The Court concluded there were issues of fact whether the University breached its contractual "obligation to provide a fundamentally fair disciplinary proceeding to Doe." *Id*. at 36. Here, John has alleged the University's inexcusable delay of over 330 days after Jane filed her complaint to schedule a hearing, resulting in the loss of witness availability, inevitable fading of memories, and loss of exculpatory evidence, violated due process and has irreparably prevented any future hearing from being fair. Compl. ¶¶ 6-32, 114-151.

Respectfully submitted,

| | |
|---|---|
| /s/Patricia M. Hamill | /s/Michael R. Schneider |
| Patricia M. Hamill, Esq. (Pa. I.D. No. 48416) | Michael R. Schneider, Esq. |
| Lorie K. Dakessian, Esq. (Pa. I.D. No. 86102) | (Mass Bar No. 44675) |
| (Admitted *Pro Hac Vice)* | Good Schneider Cormier & Fried |
| Conrad O'Brien PC | 83 Atlantic Avenue |
| 1500 Market Street, Centre Square | Boston, MA  02110 |
| West Tower, Suite 3900 | Tel: (617) 523-5933 |
| Philadelphia, PA  19102-2100 | Email:  ms@gscfboston.com |
| Tel: (215) 864-9600/phamill@conradobrien.com | |
| ldakessian@conradobrien.com | |

*Attorneys for Plaintiff John Doe*

---

[3] Another court in this district found that the concept of "basic fairness" imposes on universities an obligation "separate from and in addition to its contractual obligation to follow the rules it set forth in its Handbook," and requires a "variety of procedural protections ... many of which, in the criminal context, are the most basic and fundamental components of due process of law." *Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 601, 603 (D. Mass. 2016).

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via email to those indicated as non-registered participants on June 29, 2018.

                              /s/ Michael R. Schneider
                              Michael R. Schneider, Esquire